1  Lori Jordan Isley
   Blanca Rodriguez
2  Andrea Schmitt
   Hannah Woerner
3  COLUMBIA LEGAL SERVICES
   6 South Second Street, Suite 600
4  Yakima, WA 98901
   (509) 575-5593
5
   Kathleen Phair Barnard
6  BARNARD IGLITZIN & LAVITT LLP
   18 West Mercer Street, Ste. 400
7  Seattle, WA 98119-3971
   (206) 285-2828
8
                    UNITED STATES DISTRICT COURT
9                   EASTERN DISTRICT OF WASHINGTON

10 RAMON TORRES HERNANDEZ, and
   FAMILIAS UNIDAS POR LA JUSTICIA,        No. 1:20-CV-03241-SMJ
11 AFL-CIO, a labor organization;
12
                         Plaintiffs,       FIRST AMENDED
13      vs.                                COMPLAINT FOR
                                           DECLARATORY AND
14 UNITED STATES DEPARTMENT OF             INJUNCTIVE RELIEF
   LABOR and EUGENE SCALIA, in his
15 official capacity as United States Secretary
   of Labor,
16
17
                         Defendants.
18

19              **I.  PRELIMINARY STATEMENT**

20     1.     For decades, the prevailing practice in Washington State's tree fruit

21 industry has been to pay piece-rate wages to farmworkers who harvest our state's

22 cherry, pear, and apple crops. Piece-rate wages benefit agricultural employers

23

FIRST AMENDED COMPLAINT FOR                    COLUMBIA LEGAL SERVICES
DECLARATORY AND INJUNCTIVE RELIEF - 1          6 South Second Street, Suite 600
                                               Yakima, WA 98901
                                               (509) 575-5593

because they reward farmworkers who work quickly with wages well above minimum wage, and thus, ensure that highly perishable crops are harvested on-time to maximize grower profits.

2.     By picking as many lugs or bins of fruit in a day as their bodies will tolerate, the average farmworker earns $18 an hour on piece rate harvest wages while highly skilled farmworkers can earn wages well in excess of $20 per hour. Impoverished farmworker families rely on peak piece-rate harvest wages to pay rent and buy food when seasonal work disappears during the winter and early spring.

3.     For decades, Washington's piece-rate wage system has operated in a labor market in which growers had to set piece-rates based on principles of supply and demand. Farmworkers either accepted the offered wages and began work or negotiated for increased wages. If an agreement could not be reached, farmworkers had the freedom to pursue a better deal at the next orchard down the road.

4.     The recent rise in the tree-fruit industry's use of the federal H-2A program to recruit thousands of foreign workers and their efforts to influence state wage surveys, now threaten to undermine the decades-old prevailing practice of paying higher piece-rate wages unless governmental agencies fulfill their statutory mandate to protect the wages and working conditions of U.S. farmworkers.

FIRST AMENDED COMPLAINT FOR
DECLARATORY AND INJUNCTIVE RELIEF - 2

5.      Agricultural employers using the H-2A system realize they do not need piece-rate wages to incentivize foreign H-2A workers to accept their jobs or to meet production demands because those vulnerable workers are tied to single employer through their work visas and they have no ability to seek better wages or working conditions at a neighboring orchard. Accordingly, H-2A employers can attempt to reduce their labor costs by pegging harvest wages to lower hourly minimum wages. This violates the statutory mandate of the H-2A program which prohibits practices that adversely affect the wages and working conditions of U.S. farmworkers.

6.      This case challenges USDOL's role in arbitrarily interjecting the "hourly wage guarantee" concept into Washington's prevailing wage surveys, which mirrors changes advocated by the agricultural industry, resulting in the elimination of higher piece-rate wages for the 2021 cherry, pear and apple harvests, replacing them with the drastically lower minimum wage.[1] In addition, the case challenges the arbitrary failure to use worker interviews to verify the data supplied by employers and the arbitrary imposition of a "15 percent sample size"

---

[1] Washington's current minimum wage is $13.50 and will increase to $13.69 on January 1, 2021.

FIRST AMENDED COMPLAINT FOR
DECLARATORY AND INJUNCTIVE RELIEF - 3

COLUMBIA LEGAL SERVICES
6 South Second Street, Suite 600
Yakima, WA 98901
(509) 575-5593

threshold which have also contributed to the elimination of higher piece-rate wages in the same harvests.

7.     Ramon Torres Hernandez and Familias Unidas por la Justicia, AFL-CIO (FUJ) seek immediate declaratory and injunctive relief to prevent this arbitrary agency action from drastically slashing the wages of Washington farmworkers and to preserve the status quo until a prevailing wage survey that complies with federal law can be completed.

## II. JURISDICTION AND VENUE

8.     This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 (federal question) and §2201(a) (declaratory relief). Jurisdiction is also proper under the judicial review provision of the Administrative Procedure Act, 5 U.S.C. § 702.

9.     Declaratory and injunctive relief is sought consistent with 5 U.S.C. §§ 705 and 706 and as authorized in 28 U.S.C. §§ 2201 and 2202.

10.     The proper venue for this action is in the Eastern District of Washington pursuant to 28 U.S.C. § 1391(e)(1) because Defendants are an agency of the United States and an officer acting in his official capacity, no real property is involved in this action, and Plaintiff Ramon Torres Hernandez resides in the District.

FIRST AMENDED COMPLAINT FOR
DECLARATORY AND INJUNCTIVE RELIEF - 4

COLUMBIA LEGAL SERVICES
6 South Second Street, Suite 600
Yakima, WA 98901
(509) 575-5593

### III.    PARTIES

11.    Plaintiff Ramon Torres Hernandez ("Plaintiff Torres") resides in Yakima County, Washington. Plaintiff Torres is a U.S. worker within the meaning of 20 C.F.R. § 655.103(b) who harvested cherries, pears, and apples in 2020, and intends to seek agricultural employment, including harvesting tree fruit in the Yakima Valley in 2021 and beyond. Plaintiff Torres is a member of Familias Unidas por la Justicia.

12.    Plaintiff Familias Unidas por la Justicia (FUJ) is a farmworker labor union with approximately 900 members statewide and is affiliated with the Washington State Labor Council, AFL-CIO. FUJ's members, many of whom have families with small children, earn annual wages that put them at or below federal poverty guidelines. USDOL's failure to set prevailing wages as required by federal law will result in substantial decreases to FUJ members' already meager wages. FUJ brings this action on behalf of its members and farmworkers who rely on higher piece-rate wages to support themselves and their families.

13.    Defendant Eugene Scalia is the Secretary of Labor and charged with the supervision and management of all decisions and actions within the United States Department of Labor (USDOL). Plaintiffs sue Secretary Scalia in his official capacity.

FIRST AMENDED COMPLAINT FOR
DECLARATORY AND INJUNCTIVE RELIEF - 5

COLUMBIA LEGAL SERVICES
6 South Second Street, Suite 600
Yakima, WA 98901
(509) 575-5593

14.     Defendant USDOL is an agency of the United States within the meaning of the APA. It is responsible for overseeing and approving annual wage and working conditions surveys under the H-2A program to primarily protect the working conditions of domestic farmworkers and only issuing labor certifications to import foreign workers if sufficient domestic workers are not available to fill the jobs, as set forth in the Immigration and Nationality Act (INA), 8 U.S.C. § 1188.

## IV.    STATUTORY AND REGULATORY BACKGROUND

15.     The H-2A program allows U.S. employers to bring foreign nationals to the United States to fill temporary agricultural jobs where the supply of U.S. workers is insufficient, if and only if, the importation of such workers does not depress the wages and working conditions of domestic farmworkers.

16.     The modern-day H-2A program traces back to 1952, when Congress passed the Immigration and Nationality Act.  The 1952 program authorized the use of temporary foreign labor but did not distinguish between agricultural and non-agricultural workers.  The "H-2" program was available to employers for agriculture and non-agriculture jobs until 1986, when the Immigration Reform and Control Act of 1986 (IRCA), P.L. 99-603, § 301, 100 Stat. 3359 (1986), amended the INA by establishing a separate H-2A visa classification for agricultural workers and H-2B for non-agricultural temporary foreign workers.

FIRST AMENDED COMPLAINT FOR
DECLARATORY AND INJUNCTIVE RELIEF - 6

COLUMBIA LEGAL SERVICES
6 South Second Street, Suite 600
Yakima, WA 98901
(509) 575-5593

17.     The 1986 revisions to the foreign guestworker program were motivated by Congress's desire to ameliorate the various problems experienced under the Bracero program, the most significant of which was the "inadequacy of ... protections for farmworkers." H.R. Rep. 99-682, at 80 (1986); *see Labor Certification Process for the Temporary Employment of Aliens in Agriculture and Logging in the United States*, 52 Fed. Reg. 20,496 (June 1, 1987).  The protections afforded to U.S. and foreign guest workers under the H-2A program are thus informed by, and should be considered in the context of, the problems with the Bracero program.

18.     The Bracero program was intended to increase the number of available farmworkers in the United States during the World War II worker shortage by authorizing the entry of Mexican nationals for temporary farm work. The program existed from 1942 to 1964. *See* Adam B. Cox & Cristina M. Rodriguez, *The President and Immigration Law*, 119 Yale L.J. 458, 487-90 (Dec. 2009).

19.     While the Bracero program was in effect, it "was the chief source of foreign labor in the United States." Robert C. McElroy & Earle E. Garett, USDA Econ. Research Serv., *Termination of the Bracero Program: Some Effects on Farm Labor and Migrant Housing Needs*, Agric. Econ. Report No. 77 (June 17, 1965). Although the United States benefitted from this cheap source of labor, Congress

FIRST AMENDED COMPLAINT FOR
DECLARATORY AND INJUNCTIVE RELIEF - 7

COLUMBIA LEGAL SERVICES
6 South Second Street, Suite 600
Yakima, WA 98901
(509) 575-5593

acknowledged that "[t]he Bracero program has been likened by some to indentured slavery where employer exploitation was rampant and inhumane." H.R. Rep. 99-682, at 83. Some of the major problems under the Bracero program included underpayment, dangerous working conditions, unhealthy living conditions, and threats of deportation by employers.

20.    Beyond the substandard working and living conditions experienced by Mexican Bracero workers, the program also caused the wages paid to U.S. workers in the agriculture and railroad sectors to decline sharply, despite the inclusion in the Bracero program of mechanisms designed to prevent adverse wage effects on U.S. workers. *See, e.g.*, Cong. Research Serv., *The Effects on U.S. Farm Workers of an Agricultural Guest Worker Program* 4-5 (Dec. 28, 2009), https://www.everycrsreport.com/reports/95-712.html.

21.    Outrage over the inhumane treatment of Bracero workers and the program's downward pressure on wages led Congress to end the program in 1964. When enacting the modern H-2A program, Congress was well aware of the past problems in the Bracero program.  *See* H.R. Rep. 99-682, at 83.

22.    As a result of Congress's attempt to avoid replicating the problems in the H-2A program, in order for employers to secure the benefits of foreign labor under the current H-2A program, they must complete a multi-step process.

FIRST AMENDED COMPLAINT FOR
DECLARATORY AND INJUNCTIVE RELIEF - 8

COLUMBIA LEGAL SERVICES
6 South Second Street, Suite 600
Yakima, WA 98901
(509) 575-5593

23.     Prior to filing a petition with U.S. Citizenship and Immigration Services (USCIS), a division of the Department of Homeland Security, the employer must obtain a temporary labor certification from USDOL's Office of Foreign Labor Certification (OFLC) that "there are not sufficient workers who are able, willing, and qualified, and who will be available at the time and place needed, to perform the labor or services involved in the petition," and that "**the employment of [foreign] labor . . . will not adversely affect the wages and working conditions of workers in the United States similarly employed.**" 8 U.S.C. § 1188(a)(1) (emphasis added).

24.     Employer use of the H-2A program has risen in recent years.  In Fiscal Year 2020, USDOL certified 275,430 positions to be potentially filled by H-2A workers. Declaration of Arasele Bueno (Bueno Decl.), Ex. 22. The vast majority of these certifications were for crop workers (88.1% of the certifications), agricultural equipment operators (5.6%), or ranch or aquaculture workers (4.0%). *Id.* In Fiscal Year 2020, USDOL certified 26,832 positions in Washington State, making it the third highest user of H-2A workers in the nation. *Id.*

25.     The USDOL has promulgated regulations that govern the H-2A labor certification process. 20 C.F.R. Ch. V, Pt. 655, Subpt. B. These regulations contain numerous specific requirements for employers seeking to hire workers through the H-2A program.

FIRST AMENDED COMPLAINT FOR
DECLARATORY AND INJUNCTIVE RELIEF - 9

26.    To fulfill its duty to prevent an adverse effect on the wages of domestic farmworkers, USDOL regulations require that employers pay a wage that is the highest of the AEWR,[2] the prevailing hourly wage or piece rate, the agreed-upon collective bargaining wage, or the Federal or State minimum wage. 20 C.F.R. § 655.120(a); *see also* 20 C.F.R. § 655.122(l).

27.    Additional regulations promulgated under the Wagner-Peyser Act,[3] 29 U.S.C. § 49 *et seq.*, require the State Workforce Agency (SWA) to ensure for

---

[2] The Adverse Effect Wage Rate (AEWR) is defined as:

the minimum wage rate that the Administrator of the Office of Foreign Labor Certification (OFLC) has determined must be offered and paid to every H–2A worker employed under the DOL–approved Application for Temporary Employment Certification in a particular occupation and/or area, as well as to U.S. workers hired by employers into corresponding employment during the H–2A recruitment period, to ensure that the wages of similarly employed U.S. workers will not be adversely affected.

29 C.F.R. § 502.10. The AEWR is often referred to as the minimum hourly wage for the H-2A program.

[3] The Wagner-Peyser Act, passed by Congress during the Great Depression, created a public employment system aimed at improving the employment prospects and lives of farmworkers in the United States. *See Alfred L. Snapp & Son, Inc. v. Puerto Rico, ex rel., Barez,* 458 U.S. 592, 594-96 (1982). The system was intended to protect against wage depression for local farmworkers through the

FIRST AMENDED COMPLAINT FOR
DECLARATORY AND INJUNCTIVE RELIEF - 10

all agricultural job orders, H-2A and non-H-2A, that "wages . . . offered are not less than the prevailing wages . . . among similarly employed farmworkers in the area of intended employment or the applicable Federal or State minimum wage, whichever is higher." 20 C.F.R. § 501(c)(2)(i).

28.    The SWA in Washington State is the Employment Security Department (ESD).

29.    ESD, as the SWA, is required to conduct prevailing wage surveys using the standards set forth by USDOL in Handbook 385. *See* 84 Fed. Reg. 36168, 36184 (Jul. 26, 2019). The Handbook pre-dates the creation of the H-2A program and has not been updated since 1981. *Id.* at 36185. The prevailing wage is intended to provide an additional safeguard against wage depression in local areas through the importation of outside labor. 85 Fed. Reg. 70445, 70450 (Nov. 5, 2020).

recruitment of more desperate workers willing to accept lower wages. *See id.* The current regulatory structure is the result of litigation challenging the abject failure of state job service agencies to protect the wages and working conditions of domestic farmworkers. *See NAACP, W. Region v. Brennan,* 360 F. Supp. 1006, 1014 (D.D.C. 1973) (commonly referred to as the Judge Richey decision); 45 Fed. Reg. 39454 (Jun. 10, 1980).

FIRST AMENDED COMPLAINT FOR
DECLARATORY AND INJUNCTIVE RELIEF - 11

30.    The first sentence in Handbook 385 states the purpose of prevailing wage surveys: "Accurate farm wage data are essential to the effective operation of the Public Employment Service in serving farm employers and farm workers and in implementing the Secretary's regulations on the intra/interstate recruitment of farmworkers. (20 C.F.R. § 653.501)". Bueno Decl., Ex. 2 at 102 [I-111].

31.    Handbook 385 also provides: "Data supplied by employers **must** be verified through worker interviews." *Id.* at 108 [I-116] (emphasis added).

## V.    STATEMENT OF FACTS

### A.    Prevailing Piece-Rates Exceeding Statutory Minimums Are Well Established in Washington State

32.    From 2006-2018, the wage survey process in Washington State determined, consistent with the agricultural industry's decades-old practice, that piece-rate wages were the prevailing wages for the harvest of apples, cherries and pears. *See* U.S. Dep't of Labor, Agricultural Online Wage Library, https://www.foreignlaborcert.doleta.gov/reader-archive.cfm?abbr=WA.

33.    Those findings were also consistent with what the agricultural industry touted as a wage system that benefitted both growers and farmworkers.

34.    In January 2015, when the issue of whether farmworkers being paid the piece rate were entitled to paid rest breaks was before the Washington Supreme Court, three agricultural industry entities, including the Washington Farm Labor

FIRST AMENDED COMPLAINT FOR
DECLARATORY AND INJUNCTIVE RELIEF - 12

COLUMBIA LEGAL SERVICES
6 South Second Street, Suite 600
Yakima, WA 98901
(509) 575-5593

Association ("WAFLA"),[4] filed an amicus brief asserting that piece rates are the common method of payment for hand harvesting crops. Bueno Decl., Ex. 3 at 152.

35.     More specifically, the agricultural industry asserted that "Washington is number one in the harvest of: apples, sweet cherries and pears, all of which are traditionally handpicked at piece rate wages." *Id.* at 154.

36.     Moreover, the agricultural industry argued that skilled piece-rate workers often make more than $20 an hour under this system. *Id.*

37.     The agricultural industry further argued that both farmers and farmworkers benefit under a piece-rate system of pay. *Id.* at 152-53.

38.     The agricultural industry argued that with the advent of the Washington minimum wage, piece rate compensation was tethered to an "hourly minimum wage guarantee." *Id.* at 152

---

[4] At this time, WAFLA asserted it was an association comprising hundreds of agricultural employers in Washington State and that its members included companies that employ hundreds to thousands of workers on a piece rate basis. It further asserted that it filed approximately 80 percent of the H-2A applications in Washington and was the second largest employer of H-2A foreign workers in the nation.

FIRST AMENDED COMPLAINT FOR
DECLARATORY AND INJUNCTIVE RELIEF - 13

COLUMBIA LEGAL SERVICES
6 South Second Street, Suite 600
Yakima, WA 98901
(509) 575-5593

39.     The Washington State minimum wage and the AEWR, for growers using the H-2A program, were the *only* hourly wage guarantees referenced as being used in connection with the piece-rate system. *See id.* at 152-56.

40.     In July 2015, the Washington Supreme Court held that farmworkers being paid the piece rate were entitled to be paid for rest periods at their regular rate of pay or the minimum wage, whichever was greater. *Lopez Demetrio v. Sakuma Bros. Farms, Inc.*, 183 Wn.2d 649, 663, 355 P.3d 258, 266 (2015).

41.     In response to that decision, tree fruit growers sought relief from liability for back wages owed for failure to pay farmworkers for their rest breaks from the Washington State Legislature.

42.     During a legislative hearing on the bill in February 2017, the agricultural industry presented a video in support of the piece-rate system including worker testimony that the piece-rate system gives them a chance to make more money, estimating workers earn $250 to $300 per day during the cherry harvest.[5]

---

[5] Testimony available at: https://www.tvw.org/watch/?clientID=9375922947&eventID=2017021224&eventID=2017021224&startStreamAt=2068&stopStreamAt=2293&autoStartStream=true (starting at approximately 34:00).

FIRST AMENDED COMPLAINT FOR
DECLARATORY AND INJUNCTIVE RELIEF - 14

COLUMBIA LEGAL SERVICES
6 South Second Street, Suite 600
Yakima, WA 98901
(509) 575-5593

43.     During that same hearing West Mathison testified as the President of Stemilt Growers, the largest grower of apples and pears in the United States, and on behalf of the industry and 80 other growers who bring their fruit to Stemilt's fruit packing warehouses. Mr. Mathison testified that the average piece-rate pay was approximately $18.00 per hour.[6]

44.     Mr. Mathison further testified that piece-rate wages allow Stemilt to "fairly compensate [farmworkers] at rates higher than minimum wage and with better productivity to the company."

45.     Wage data obtained from Stemilt affirms the agricultural industry's representations to the Washington Supreme Court: domestic piece-rate workers earned on average $20.00 per hour picking cherries in 2016 and $24.10 per hour in 2017. Bueno Decl., Ex. 3 at 143-44 ¶ 5; *see also* Declaration of Rachael Pashkowski (Pashkowski Decl.) ¶ 14 (calculating average earnings for domestic and foreign H-2A workers).

46.     An East Wenatchee grower recently reported that his 2019 cherry pickers averaged $35 per hour when their piece rate is converted to an hourly rate. Bueno Decl., Ex. 7.

---

[6] *Id.* (starting at approximately 100:52).

FIRST AMENDED COMPLAINT FOR
DECLARATORY AND INJUNCTIVE RELIEF - 15

COLUMBIA LEGAL SERVICES
6 South Second Street, Suite 600
Yakima, WA 98901
(509) 575-5593

47.     Plaintiff Torres can make more than $30 per hour when picking cherries by the piece rate, harvesting five bins in about eight hours, depending on conditions and the piece-rate, consistent with worker testimony in the legislative process. Declaration of Ramon Torres Hernandez (Torres Decl.) ¶ 8.

48.     An organizer with the United Farm Workers (UFW) who submitted a declaration in connection with ESD's 2019 Wage Survey Results declared that farmworkers when being paid by the piece rate for harvesting cherries commonly earn over $20.00 an hour. Bueno Decl., Ex. 3 at 142.

**B.     Washington Agricultural Industry Efforts to Replace Higher Paying Piece Rates with the Minimum Wage**

49.     In the fall of 2015 following the Washington Supreme Court's landmark decision in *Lopez Demetrio* in July, the piece-rate rest-break case, the agricultural industry, led by the director of WAFLA, Dan Fazio, engaged in a concerted campaign to eliminate prevailing piece-rate wage findings in connection with Washington's Agricultural Wage survey.

50.     Mr. Fazio implored growers to report on their wage survey forms that they had paid Washington State minimum wage or the AEWR for the harvesting of tree fruit, rather than reporting the piece rates actually paid. Mr. Fazio justified this false reporting on the basis that these hourly minimum wages were "guaranteed hourly" rates. *See* Bueno Decl., Ex. 3 at 133, 136 & 137.

FIRST AMENDED COMPLAINT FOR
DECLARATORY AND INJUNCTIVE RELIEF - 16

51.    The WAFLA campaign orchestrated by Mr. Fazio directly contradicted the amicus brief filed by WAFLA and other agricultural industry groups just months earlier with the Washington Supreme Court. *Supra* ¶¶ 34-39; *Cf.* Bueno Decl., Ex. 3 at 134 & 153-54.

52.    After an investigation, ESD concluded that the wage survey data was tainted, with apple, pear and cherry growers improperly influenced by the WAFLA campaign. Bueno Decl., at Ex. 8 & Ex. 9 at 262-63 & 10. Had ESD not removed the tainted data many harvest activities would have been reduced to the Washington State minimum wage rather than higher prevailing piece-rate wages.

53.    In response to grower manipulation of the 2015 wage survey, farmworker advocates called upon ESD to conduct worker surveys as required by Handbook 385.

54.    ESD had not previously collected wage data using worker surveys, but pledged to do so beginning in 2016. *See* ECF No. 6-11 at 386.

55.    Despite the mandate to verify wage data supplied by employers through a worker survey, USDOL has failed to use the worker survey data collected by ESD to verify employer data and has informed ESD that the worker data cannot be used in reaching the prevailing wage findings. ECF No. 6-32 at 794.

56.    Following the agricultural industry interference with the 2015 wage survey, for the first time, the 2016 wage survey in Washington included the

FIRST AMENDED COMPLAINT FOR
DECLARATORY AND INJUNCTIVE RELIEF - 17

COLUMBIA LEGAL SERVICES
6 South Second Street, Suite 600
Yakima, WA 98901
(509) 575-5593

"guaranteed hourly wage" concept. *See* Bueno Decl., Ex. 3 at 133. On information and belief, ESD added the question about hourly guarantees to the wage survey in response to Mr. Fazio's advocacy and USDOL's approval. *See id.*

57.    USDOL ignored the fact that the "hourly guarantee" concept was meaningless given that the Washington State minimum wage and the AEWR are statutorily mandated and therefore apply to all employers, whether employers report them or not. *See id.* at 134 (explaining the hourly guarantee concept as an anachronism from a time when many farmworkers were not covered by minimum wage laws, but Puerto Rican workers had enhanced wage protections under Public Law 87); *infra* ¶ 94.

58.    For the first time, the wage survey results included piece rate wages for cherry, apple and pear harvest that also included an hourly guarantee. *See* U.S. Dep't of Labor, Agricultural Online Wage Library, https://www.foreignlaborcert. doleta.gov/reader-archive.cfm?abbr=WA (May 25, 2017 findings).

59.    Virtually all hourly guarantees reported for fruit harvest activities were pegged to either the 2016 Washington Minimum Wage of $9.47 per hour or the 2016 AEWR of $12.69. *See id;* Pashkowski Decl. ¶ 11 (historical AEWR rates).

COLUMBIA LEGAL SERVICES
6 South Second Street, Suite 600
Yakima, WA 98901
(509) 575-5593

60.    Wages for farmworkers were not obviously impacted during the 2017 harvests because both piece rates and guaranteed hourly rates were included and agricultural employers were required to offer the higher piece rate wages.

61.    In 2018, after ESD released initial results from the 2017 wage survey, finding, as usual, that higher piece-rate pay was the prevailing practice in apple harvest, the industry objected, in part, on the grounds that ESD could not use data if it did not represent 15 percent of all workers in a given activity, and ESD reversed its initial findings. *See* Bueno Decl*., Ex. 10 at 270.

62.    After learning of ESD's reversal, Dan Fazio, in a newsletter to all WAFLA members, crowed about the role industry lobbyists played in eliminating higher piece rate wages for farmworkers stating, "[I]n case you didn't hear . . . [ESD] removed all piece rates for apples for growers that utilize the H-2A program effective June 19[, 2018].  This is a huge win and saved the apple industry millions. Really glad we could help." *Id.*, Ex. 12 at 278.

63.    Realizing its mistake, ESD reversed course yet again, and attempted to restore higher prevailing piece-rate wages for the 2018 apple harvest advocating to USDOL that the arbitrary imposition of thresholds from Handbook 385 fails to consider valid statistical findings and in this case "**lead to a large decrease in the required wage for workers in the Washington apple harvest**" which is "**in direct conflict with the fundamental goal of the H-2A temporary agricultural**

FIRST AMENDED COMPLAINT FOR
DECLARATORY AND INJUNCTIVE RELIEF - 19

**program to ensure domestic workers are not adversely effected by the use of foreign labor**." *Id.,* Ex. 11 at 273 (emphasis added).

64.    ESD specifically advocated that USDOL use the worker survey to verify employer responses, as required by Handbook 385. *Id.*

65.    ESD observed that Red Delicious harvesting was paid at approximately $22.15 per hour, when converted from a piece rate, as opposed to the AEWR then in effect of $14.12 per hour. *Id.* at 274.

66.    ESD further urged USDOL to consider the worker survey in conjunction with employer responses where sample size thresholds were "slightly below" the 15 percent sample size threshold,[7] to prevent no findings of prevailing wages for a number of apple varieties in harvesting. *Id.* at 274-75. The thresholds ranged from 10.74 percent of the worker population to 13.39 percent. *Id.*

67.    Ultimately, USDOL refused to publish any apple harvest wage data from 2017. This decision prevented the wholesale elimination of piece rate wages

---

[7] USDOL has a policy of requiring that wage survey samples collected from employers meet or exceed a certain percentage of workers employed in the crop activity even though Handbook 385 provides the sample size as a "general guide" rather than a mandate. *See supra* ¶ 63; ECF No. 6-2 at 219 (sample size of 15 percent of workers for crop activities with 3000 or more workers).

FIRST AMENDED COMPLAINT FOR
DECLARATORY AND INJUNCTIVE RELIEF - 20

COLUMBIA LEGAL SERVICES
6 South Second Street, Suite 600
Yakima, WA 98901
(509) 575-5593

for farmworkers in the 2018 apple harvest but resulted in the use of 2016 piece rate determinations for apple harvest which deprived workers of any increase in wages from 2017. *Id.,* Ex. 10 at 271.

### C.    The 2019 Wage Survey Eliminates Many Prevailing Piece-Rates for Harvest Activities Replacing them with the Minimum Wage

68.    The 2019 Washington prevailing wage survey continued the use of the "hourly wage guarantee" concept, which has resulted in the total elimination of higher paying piece-rates for almost all cherry, pear and apple harvest activities and replaced them with the Washington State minimum wage. *See id.*, Ex. 13 at 287-88. USDOL's arbitrary failure to use the worker survey to verify the data supplied by employers and the arbitrary imposition of a threshold sample size also contributed to the elimination of higher piece-rate wages in the same harvests.

69.    USDOL interjected the "hourly wage guarantee" concept into the prevailing wage finding methodology, even though it is not defined or required by the regulations or other written guidance and contravenes the statutory mandate to protect U.S. farmworkers wages from adverse effects. *See infra* ¶¶ 88-93 & 104-108.

70.    By treating piece-rates with an "hourly wage guarantee" as different rates of payment from piece-rates without a guarantee, many piece-rate wages were totally excluded from consideration, even though the data shows the vast majority

FIRST AMENDED COMPLAINT FOR
DECLARATORY AND INJUNCTIVE RELIEF - 21

of growers reporting a wage guarantee identified a "wage guarantee" rate that was the equivalent to or lower than statutorily required minimums. There is no basis to distinguish a piece rate without an hourly guarantee, that is subject to statutorily required minimums, from a piece rate with an hourly wage guarantee at or below those same minimum-wage standards.[8]

71.     Farmworker advocates raised grave concerns with the prevailing wage findings with both ESD and USDOL resulting in a delay in USDOL publishing the results. *See* Bueno Decl., Exs. 3, 4, 5 & 6. That delay will not cure the irreparable harm to Washington's farmworkers who will be deprived of any wage increase for 2021 and discouraged from seeking jobs at farms that employ H-2A workers, as described below.

---

[8] Farmworkers and their advocates have also called into question whether wage guarantees, other than statutorily required minimums, are actually used in Washington State; they certainly are not a common or regular practice. *See* Bueno Decl., Ex. 3 at 132 n.2 & 133; Torres Decl. ¶ 7; FUJ Decl. ¶ 14; *see also supra* ¶ 39 (the *only* hourly wage guarantees identified by the agricultural industry in 2015 were statutorily required minimums).

FIRST AMENDED COMPLAINT FOR
DECLARATORY AND INJUNCTIVE RELIEF - 22

COLUMBIA LEGAL SERVICES
6 South Second Street, Suite 600
Yakima, WA 98901
(509) 575-5593

### 1. 2019 Survey Results Undermine Piece-Rate Wages

72.    In June 2020, ESD released the results from the 2019 wage survey ("2019 Wage Survey Results"). *See* Bueno Decl., Ex. 13.

73.    Despite having found that higher piece rates, not fixed hourly wages, were the prevailing wage in Washington's cherry harvest in all prior wage surveys since 2006, the flawed 2019 wage survey results indicated that nearly all cherry harvesting activity for specific varieties changed from a piece rate wage structure to an hourly wage rate of $12.00 per hour.[9] *Id.* at 3-4 & 8-9.

74.    Based on the flawed 2019 results, the prevailing wage rate for the harvest of Dark Red, Lapin, Skeena and Yellow cherries were all drastically lowered from a piece rate wage where workers could earn over $20 an hour, to an hourly wage rate of $12.00 per hour. *Id.*

75.    These results stand in dramatic contrast to the decades-old practice of paying the piece-rate for harvesting cherries through which farmworkers earn well in excess of the minimum wage. *See supra* ¶¶ 34-36 & ¶¶ 42-48.

76.    In addition, the flawed 2019 prevailing wage data for two varieties of apples, Braeburn and Gala, and for the harvesting of Bosc pears were also similarly

---

[9] The Washington State minimum wage in 2019 was $12.00 per hour.

FIRST AMENDED COMPLAINT FOR
DECLARATORY AND INJUNCTIVE RELIEF - 23

COLUMBIA LEGAL SERVICES
6 South Second Street, Suite 600
Yakima, WA 98901
(509) 575-5593

lowered from a piece rate wage structure to an hourly wage rate of $12.00 per hour. Bueno Decl., Ex. 13 at 287-88.

77.    On July 14, 2020, ESD submitted the flawed 2019 wage survey data to USDOL. *Id.,* Ex. 6 at 248.

78.    In addition, one commodity-activity saw a decrease in the piece rate itself; blueberry harvesting was reduced from $.75 per pound from $.50 per pound. *Id.*, Ex. 13 at 283 & 287.[10]

79.    The Form ETA-232 and the Handbook 385 require SWAs to explain increases or decreases in prevailing rates form the previous year. *See* Pashkowski Decl., Ex. 9 at 156; Bueno Decl., Ex. 2 at 128 (I-143); *see also Zirkle Fruit Co*., 442 F. Supp. 3d at 1378-79 (analyzing whether the failure to explain an increase or

---

[10] In *Zirkle Fruit Co. v. United States Dep't of Labor*, 442 F. Supp. 3d 1366, 1383 (E.D. Wash. 2020), this Court upheld the $0.75 piece rate from the 2018 wage survey and ordered Zirkle to remit the wages that had been withheld from farmworkers.

> Notably, Zirkle—purportedly the state's largest blueberry grower—declined to participate in the voluntary survey, foregoing the opportunity to dramatically increase the dataset on which ESD's findings were made and—if Zirkle in fact pays less than $0.75/lb. to domestic laborers—potentially reduce the PWR.

*Id.* n.10.

FIRST AMENDED COMPLAINT FOR
DECLARATORY AND INJUNCTIVE RELIEF - 24

COLUMBIA LEGAL SERVICES
6 South Second Street, Suite 600
Yakima, WA 98901
(509) 575-5593

decrease was arbitrary and capricious, and finding no such violation where the change was from an hourly rate to piece rate, and not a change from one piece rate to another).

80.    The Form ETA-232 submitted for blueberry harvest wages fails to include any explanation of the decrease in blueberry harvest wages from $0.75 per pound to $0.50 per pound. Pashkowski Decl., Ex. 9 at 151-166.[11]

81.    In addition, the data shows that at least three grower respondents who participate in the H-2A program (reflected by reporting an hourly guarantee the equivalent of the AEWR in 2019 of $15.03) reported a piece rate below $0.75 per pound, which was the required prevailing wage that year, as upheld in the *Zirkle Fruit* case, including rates of $0.50 and $0.60 per pound. *Id.* at 149. The prevailing wage ultimately identified by ESD for the blueberry harvest was the rate reported by an employer who reported paying piece-rate wages *less than* the rate required by law. *See id.* (line highlighted in green).

---

[11] Every Form ETA-232 submitted for the 2019 Washington prevailing wage survey has a cover page referring to Braeburn apple harvesting.  This appears to be an error as the attached pages reference distinct activities, like the pages referenced here pertaining to blueberries. Pashkowski Decl., Ex. 17.

FIRST AMENDED COMPLAINT FOR
DECLARATORY AND INJUNCTIVE RELIEF - 25

82.    The 2019 survey, which led to the dramatic drop in harvest wages, yielded contrasting results for *non-harvest* wages, which have historically been paid at an hourly rate. For every non-harvest activity for which there is a comparator in the 2018 Agricultural Wage Survey, wages *increased* except for one that stayed the same (pear thinning). *Compare id.* at 8-9 *with* Ex. 14 at 6-7.

83.    Moreover, in the 2019 survey results, *every* non-harvesting commodity-activity with an hourly rate, again except for thinning pears, has an hourly rate that *exceeds* $12.00 per hour, while *every* harvesting activity that changed from a piece rate to an hourly rate is set at the minimum wage of $12.00 per hour despite the well-established understanding that wages for harvesting activities exceed other activities like pruning and thinning. Bueno Decl., Ex. 13 at 287-88; FUJ Decl. ¶ 15; *see supra* ¶¶ 32-48.

84.    In addition, in the 2019 survey results, prevailing piece-rate wages for apple and pear harvesting generally, and for specific varieties including, Fuji, Honeycrisp, Red Delicious and Bartlett pears were eliminated because USDOL refuses to accept wage results that fail to meet the 15 percent sample size threshold. *See* ECF No. 6-13 at 296-298; ECF No. 6-11 at 2-3.

85.    The responses for apple and pear harvesting and each of the varieties referenced in the preceding paragraph **exceeded** the response rate that ESD obtained in the 2017 wage survey which ESD argued should be sufficient, along

FIRST AMENDED COMPLAINT FOR
DECLARATORY AND INJUNCTIVE RELIEF - 26

COLUMBIA LEGAL SERVICES
6 South Second Street, Suite 600
Yakima, WA 98901
(509) 575-5593

with the worker survey, to set prevailing wages as set forth in the table below. *See supra* ¶ 66.

| Variety | 2017 % of Workers Represented | 2019 % of Workers Represented |
|---|---|---|
| Fuji | 11.23 | 13.83 |
| Honeycrisp | 12.16 | 13.05 |
| Red Delicious | 13.27 | 14.52 |
| Apple Harvesting | | 14.64 |
| Pears Harvesting | | 13.39 |
| Bartlett | | 13.27 |

86.    The 2019 worker survey confirmed that the most prevailing wage rate by far is the piece rate, including for the three specific varieties, Fuji, Honeycrisp and Red Delicious. ECF No. 6-32 at 3-4.

87.    ESD stated that USDOL "does not 'use' worker survey results" and therefore ESD submitted ETA 232 forms, which are used to set the prevailing wage rates, "based solely on employer responses." *Id.* at 3.

### 2.    The Arbitrary Use of the Hourly Wage Guarantee Results in the Elimination of Higher Piece-Rate Pay

88.    The regulations applicable to the use of the H-2A program and the Wagner-Peyser regulations do not include or define the terms "hourly wage guarantee" or "earnings guarantee."

FIRST AMENDED COMPLAINT FOR
DECLARATORY AND INJUNCTIVE RELIEF - 27

89.     The ETA Handbook No. 385 does not define the terms "hourly wage guarantee" or "earnings guarantee." *See* Bueno Decl., Ex. 2 at 105 (I-113).

90.     Similarly, the Handbook sections covering Standards for Preparation of Agricultural Wage Surveys and Collection of Wage Information, which describes how the SWA makes prevailing wage rate findings do not include these terms or concepts. *Id.* at 105-111 (I-113-I119). Specifically, the sections relating to 40 percent rule, the 51 percent rule, and more than one unit of payment, do not include any reference to an "hourly wage guarantee" or "earnings guarantee." *Id.* at 108-109. These handbook provisions do not require SWAs to consider an hourly wage guarantee in making prevailing wage rate findings. *Id.*

91.     The only reference in the ETA Handbook No. 385 related to an "earnings guarantee" is found in the section which provides instructions to the SWA for the completion of the Domestic Agricultural In-Season Wage Report, ETA 232. *See id.* at 124-28 (I-135-143).

92.     That section states: "Rates with earnings guarantee represent a different method of payment from piece rates without earning guarantees and should be listed separately." *Id.* at 126 (I-141).

93.     The term "earnings guarantee" is not defined in this section and not included in the special instructions. *Id.* at 124.

FIRST AMENDED COMPLAINT FOR
DECLARATORY AND INJUNCTIVE RELIEF - 28

94.     The reference is understood to be a term of art referring to historical protections afforded Puerto Rican farmworkers under Public Law 87 which entitled them to a *higher* hourly wage than other domestic farmworkers. *See* Bueno Decl., Ex. 3 at 134 & 170-225.

95.     USDOL Employment Training Administration (ETA) is responsible for reviewing SWA wage rate findings. *Id.* at 110.

96.     Once the prevailing wage results are finalized, USDOL-ETA publishes the wage results on its Agricultural Online Wage Library (AOWL). *See* https://www.foreignlaborcert.doleta.gov/aowl.cfm.

97.     The USDOL-ETA has not published any prevailing wage rates for Washington State since July 23, 2019. *Id.*

98.     In July 2019, USDOL issued a notice of proposed rulemaking (NPRM) containing numerous changes to its regulations governing the H-2A program. 84 Fed. Reg. 36168 (Jul. 26, 2019).

99.     In the NPRM, USDOL proposed to modernize the methodology used to establish the prevailing wage rate. 84 Fed. Reg. 36168, 36171 & 36184. The proposed changes are significant and include changes to the Handbook 385 and the Form ETA-232 used by SWAs to report prevailing wage survey results. *See* 84 Fed. Reg 36168, 36184-88.

FIRST AMENDED COMPLAINT FOR
DECLARATORY AND INJUNCTIVE RELIEF - 29

100.    The NPRM does not address or reference an "hourly wage guarantee" or the "earnings guarantee" in the sections dealing with proposed changes to the prevailing wage rate methodology.

101.    USDOL received over 83,000 public comments in response to the July 26, 2019 NPRM.  85 Fed. Reg. 70445.  USDOL published a final rule on the methodology by which it determines the AEWR (the minimum hourly wage for H-2A jobs) effective December 21, 2020, and it intends to address all of the remaining proposals from the July 2019 NPRM, including changes to the methodology for prevailing wage rates, in a subsequent second final rule. *Id.*.

102.    The November 5, 2020, final rule freezes AEWRs at the 2020 level for two-years. *Id.* at 70467. USDOL estimates the impact of this change will result in an average annual transfer from workers to employers of more than $167 million, or $1.68 **billion** over the next decade. *Id.* at 70447. USDOL further acknowledges that in recent years, farmworker wages have increased significantly faster than inflation or wage increases in the overall U.S. economy. *Id.* at 70452.[12]

---

[12] At least one lawsuit challenging this AEWR freeze has been filed. *See UFW v. USDOL*, Case No. 1:20-CV-01690-DAD-JLT, 2020 WL 7646406, at *1 (E.D. Cal. Dec. 23, 2020) (plaintiffs' motion for preliminary injunction granted).

FIRST AMENDED COMPLAINT FOR
DECLARATORY AND INJUNCTIVE RELIEF - 30

COLUMBIA LEGAL SERVICES
6 South Second Street, Suite 600
Yakima, WA 98901
(509) 575-5593

103.    Each year USDOL issues Training and Employment Guidance Letters (TEGL) which provide guidance to SWAs to conduct agricultural prevailing wage surveys. *See* Training and Employment Guidance Letter No. 14-19 (Apr. 13, 2020) available at https://wdr.doleta.gov/directives/attach/TEGL/TEGL_14-19.pdf.

104.    USDOL did not provide any guidance in the 2019 or 2020 TEGLs, governing the Washington State prevailing wage survey conducted in 2019 through 2020 regarding the "hourly wage guarantee" or "earnings guarantee."

105.    Pursuant to the applicable TEGLs, ESD submitted annual plans to USDOL-ETA regarding the manner in which it intended to conduct the 2019 agricultural prevailing wage survey. *See* Bueno Decl., Ex. 1.

106.    The annual plans require states to agree that they will carry out all activities, including conducting the prevailing wage survey, to support USDOL's review and processing of H-2A job orders and applications consistent with the statutory and regulatory mandate that the employment of H-2A foreign workers not adversely affect the wages and working conditions of similarly employed domestic workers. *See id.* at 13, 20-21, 24, 60, 73, & 91.

107.    The annual plans also require states to contractually agree to submit all prevailing wage survey findings in accordance with instructions contained in the TEGL. *See id.* at 24, 26, 86, & 88.

FIRST AMENDED COMPLAINT FOR
DECLARATORY AND INJUNCTIVE RELIEF - 31

108.    There are no instructions in the annual plans submitted by ESD in connection with the 2019 wage survey or in the TEGL related to the "hourly wage guarantee" or the "earnings guarantee." *See* Bueno Decl., Ex. 1.

109.    The arbitrariness of injecting the hourly wage guarantee concept into the prevailing wage determinations is well illustrated in the 2019 ETA-232 data for yellow cherry harvesting. *See* Pashkowski Decl. ¶ 21, Ex. 8.

110.    By segregating employer responses based on whether the employer reported an hourly wage guarantee, piece rate responses were eliminated, and the prevailing wage was determined to be $12 per hour - **$18 *less than* what Plaintiff Torres normally earns on piece-rate wages during the cherry harvest**. *Id.,* Ex. 8 at 127.

111.    Had the employer responses reporting a piece rate—with or without an hourly wage guarantee—been treated as the same, the piece rate would have been overwhelmingly[13] the most common method of payment and therefore the

---

[13] Nearly 80% of the employers participating in the survey for yellow cherry harvest wages reported paying piece-rate wages. Pashkowski Decl. ¶ 22. The prevailing nature of piece-rate pay for harvest activities was further reinforced by the recently released 2019 Worker Survey results, in which workers overwhelming reported piece-rate wages. Bueno Decl., Ex. 32 at 682.

FIRST AMENDED COMPLAINT FOR
DECLARATORY AND INJUNCTIVE RELIEF - 32

prevailing wage would have been a piece-rate wage. *See id.* ¶ 22. Had the

prevailing wage been set based on that piece-rate data, some yellow cherry

harvesting wages would have increased by $0.05 per pound. *Id.* ¶ 24; Bueno Decl.,

Ex. 14 at 309 (2018 wage survey set harvesting of low-density yellow cherries at

$0.25 per pound).

112.    The arbitrariness of treating these responses differently is further

underscored by the fact that, in the data set provided for yellow cherry harvesting,

96% of the employers indicating they had an hourly guarantee reported that rate

was at or *below* statutorily required minimums. Pashkowski Decl. ¶ 23. Similarly,

in the ETA-232 data provided for red cherry harvest (no variety specified), 96% of

the employers indicating they had an hourly guarantee reported that rate was at or

below statutorily required minimums. *Id.* ¶ 20.

113.    There is no basis to distinguish between a piece-rate wage with an

hourly guarantee that provides no more than statutorily required minimum wages,

the state minimum wage and the AEWR (for H-2A employers) from those without

an hourly wage guarantee because every grower must comply with statutory

minimum wages.

114.    Moreover, because USDOL and ESD fail to define "hourly wage

guarantee" or "earnings guarantee," employers were not informed whether

statutory minimums were in fact "hourly wage guarantees" or whether only hourly

FIRST AMENDED COMPLAINT FOR
DECLARATORY AND INJUNCTIVE RELIEF - 33

COLUMBIA LEGAL SERVICES
6 South Second Street, Suite 600
Yakima, WA 98901
(509) 575-5593

guarantees that *exceed* these minimums constituted an hourly wage guarantee. *See* Bueno Decl., Ex. 3 at 132; Ex. 4 at 231-32.

115.    Because "hourly wage guarantees" are not in common usage in the cherry harvest in Washington State, had employers been clearly instructed that only those guarantees that exceeded statutory minimums should have been reported, it is likely that very few would have reported an "hourly wage guarantee." *See supra* n. 8.

116.    On December 10, 2020, ESD informed stakeholders that it intends to continue to include the hourly guarantee concept in the survey methodology for the 2020 wage survey and that process is now underway. *See* Bueno Decl., Ex. 33 at 690.[14]

---

[14] The 2020 survey instrument perplexingly adds a question for employers reporting an hourly guarantee that is less than the state minimum wage. *Id.* The only way an hourly guarantee makes sense is if it provides a wage rate that exceeds statutorily required minimums. *See id.,* Ex. 5 at 231; *see also supra* ¶¶ 57 & 94.

FIRST AMENDED COMPLAINT FOR
DECLARATORY AND INJUNCTIVE RELIEF - 34

COLUMBIA LEGAL SERVICES
6 South Second Street, Suite 600
Yakima, WA 98901
(509) 575-5593

### 3. The Arbitrary Failure to Use Worker Surveys and Imposition of a Threshold Sample Size Also Result in the Elimination of Higher Piece-Rate Pay

117. The wage finding process in Handbook 385 mandates that employer wage data "**must** be verified through worker interviews." ECF No. 6-2 at 221 [I-116] (emphasis added).

118. ESD commenced conducting worker wage surveys consistent with this mandate in 2016. ECF No. 6-32 at 793; *see supra* ¶¶ 53-55.

119. USDOL provides funding to ESD to conduct the worker survey. *See* ECF No. 6-1 at 62-65 & 91-93 (ESD contracts with the University of Washington to conduct the employer and worker surveys at a total estimated cost of approximately $400,000); ECF No. 6-31 at 5 (expected total cost of 2020 surveys $698,437) & 7 (ESD must spend not more than 20% of federal grant funding on the surveys and field checks).

120. The University of Washington costs to conduct the worker survey were estimated at $144,981 for 2019 and $136,309 for 2020. ECF No. 6-31 at 5.

121. The vast majority of workers surveyed in the 2019 worker survey reported being paid by the piece rate, consistent with decades of practice recognized by the industry and farmworkers alike. ECF No. 6-32 at 3-4; *see supra* ¶¶ 32-37 & 42-48.

COLUMBIA LEGAL SERVICES
6 South Second Street, Suite 600
Yakima, WA 98901
(509) 575-5593

122.   Despite the mandate to verify wage data supplied by employers through a worker survey, USDOL advised ESD that "USDOL does not 'use' worker survey results" resulting in ESD submitting prevailing wage findings based "solely on employer responses." *Id.* at 3.

123.   USDOL's failure to use the worker surveys allowed employers reporting hourly wages as the prevailing practice to go unchallenged and unverified.

124.   USDOL moreover requires prevailing wage survey responses collected from employers to meet sample thresholds that meet or exceed a certain percentage of workers employed in the crop activity. *See supra* ¶¶ 61-67.

125.   Handbook 385 provides the sample response size as a "general guide" not a mandate. ECF No. 6-2 at 4 [I-114].

126.   ESD previously asserted that USDOL's insistence on these thresholds was arbitrary and, would result in a large decrease in workers' apple harvest wages, in direct conflict with the fundamental goal of the H-2A program to ensure domestic workers are not adversely affected by the use of foreign labor. ECF No. 6-11 at 2.

127.   ESD advocated that USDOL accept survey results slightly below the 15 percent threshold, in combination with worker survey results, to set prevailing piece-rate wages. *Id.* at 3.

FIRST AMENDED COMPLAINT FOR
DECLARATORY AND INJUNCTIVE RELIEF - 36

COLUMBIA LEGAL SERVICES
6 South Second Street, Suite 600
Yakima, WA 98901
(509) 575-5593

128.    The 2019 Worker survey eliminates piece-rate wages for apple and pear harvesting generally, and for specific varieties including, Fuji, Honeycrisp, Red Delicious and Bartlett pears based on failing to meet USDOL's 15 percent sample size threshold. ECF No. 6-13 at 18-19.

129.    The responses for apple and pear harvesting and each of the varieties referenced in the preceding paragraph **exceeded** the response rate that ESD previously argued should be sufficient, in conjunction with the corroborating worker survey, to set prevailing wages. *See supra* ¶¶ 66 & 85.

130.    For apple harvesting generally and Red Delicious harvesting the survey sample collected was barely under the 15 percent threshold at 14.64 and 14.52 percent, respectively.

131.    USDOL's insistence on accepting only employer wage data reaching certain response thresholds, when such thresholds are included in Handbook 385 as a general guide, results in the disregard of statistically relevant data and rewards employers' failure to participate in the wage survey process such that the lack of sufficient data results in the elimination of higher piece-rate wages.

**D.    The USDOL-Sanctioned Hourly Guarantee Concept and Additional Arbitrary Actions Irreparably Harms Washington Farmworkers**.

132.    As in past controversies related to the prevailing wage rate findings, following concerns being raised by advocates, a stalemate has now resulted, with

FIRST AMENDED COMPLAINT FOR
DECLARATORY AND INJUNCTIVE RELIEF - 37

COLUMBIA LEGAL SERVICES
6 South Second Street, Suite 600
Yakima, WA 98901
(509) 575-5593

no corrections made to the 2019 wage survey (thus no current prevailing wages published) and employers defaulting to using wages from the 2018 Wage Survey in their H-2A Clearance Orders (effectively H-2A contracts) for 2021. *See supra* ¶¶ 61-67.

133.    Many of the Clearance Orders filed for 2021 to date have language that reserves the employers' right to lower wages based on rates published on the AOWL and many include apple, pear and cherry harvest wages that would be reduced when prevailing wages based on the 2019 Wage Survey are published on the AOWL. *See* Bueno Decl., Exs. 15, 17, 19, & 20.

134.    National data sources document a trend of farmworker wage increases averaging approximately 5% per year in Washington State and nationally, with the Pacific Region (Oregon and Washington) slightly higher at an average of 6% per year. Declaration of Rachael Pashkowski at ¶¶ 5-7, 9-10, & 13; Bueno Decl., Ex. 21 (agricultural labor economist documents trend of farmworker wage increases that exceed the Employment Cost Index (ECI)).

135.    This Court recognized the national trend of increases in farmworker wages in another prevailing wage challenge. *Evans Fruit Co., Inc. v. United States Dep't of Labor*, 1:19-CV-03202-SMJ, 2019 WL 7820432, at *5 (E.D. Wash. Oct. 11, 2019) (citing statistical data from the U.S. Department of Agriculture).

FIRST AMENDED COMPLAINT FOR
DECLARATORY AND INJUNCTIVE RELIEF - 38

COLUMBIA LEGAL SERVICES
6 South Second Street, Suite 600
Yakima, WA 98901
(509) 575-5593

136.    ESD's prevailing wage surveys also show a general increase in piece rate wages over time. Pashkowski Decl. ¶ 12.

137.    Similarly, the Adverse Effect Wage Rate (AEWR) set by the USDOL has historically increased on average over 5% per year, with a 2020 increase of 5.3%. Pashkowski Decl. ¶ 11; *see supra* ¶ 102 & *infra* ¶ 143 (background related to USDOL freezing the AEWR for two years and related issues).

138.    The flaws in the survey methodology, which have resulted in no prevailing wage findings for 2019 and have left employers using 2018 wage survey information while reserving the right to decrease wages in the future, discourages Washington farmworkers like Plaintiff Torres from applying for those jobs and depresses the labor market. Torres Decl. ¶ 14; FUJ Decl. ¶ 16.

139.    Moreover, if the 2019 Wage Survey Results are not corrected and are published as submitted by ESD on the AOWL, certain piece-rate wages will be eliminated. *See supra* at ¶¶ 68 & 73-76.

140.    The elimination of piece rates in the cherry harvest and reduction to the Washington State minimum wage would result in an approximate 30% reduction in hourly wages based on both industry and worker provided data. *See* Pashkowski Decl. ¶¶ 14 & 16; Bueno Decl., Ex. 3 at 142 (UFW reports the same approximate piece-rate earnings as those analyzed in Pashkowski declaration ¶ 14).

FIRST AMENDED COMPLAINT FOR
DECLARATORY AND INJUNCTIVE RELIEF - 39

COLUMBIA LEGAL SERVICES
6 South Second Street, Suite 600
Yakima, WA 98901
(509) 575-5593

141.   If paid at the Washington State minimum wage instead of a prevailing piece rate, **Plaintiff Torres would lose over $3,400 (17%) of his annual earnings**. *See* Torres Decl. ¶ 8; Pashkowski Decl. ¶ 15.

142.   Moreover, if the 2019 Wage Survey Results that eliminate piece rates are left to stand, employers will be even more likely to seek H-2A workers at new, much lower harvest wage rates. This will result in even more workers being paid below true prevailing-wage rates and will drive down the wages paid to all farmworkers, contrary to USDOL's statutory and regulatory framework. *See Zirkle Fruit Co. v. United States Dep't of Labor*, 1:19-CV-03180-SMJ, 2019 WL 7819653, at *2 (E.D. Wash. Nov. 7, 2019) (recognizing that lower prevailing wage rates would depress the wages of Washington workers as the basis for permitting ESD intervention in employer challenges to prevailing wage surveys); *supra* ¶¶ 34-36 & 42-48.

143.   Because most farmworkers live at or below the poverty line, a reduction in wages, even of 5%, can mean the difference between keeping a family housed or becoming homeless, feeding a family or going hungry, and risking illness or paying for medicine, harm that cannot be undone through the payment of back wages. *See* FUJ Decl. ¶¶ 7, 16-17; Torres Decl. ¶¶ 2 & 14-15; Bueno Decl., Ex. 30 at 562; *see also United Farm Workers v. Perdue*, No. 1:20-cv-01452-DAD-JLT, 2020 WL 6318432, at *14 (E.D. Cal. Oct. 28, 2020) (finding failure to

FIRST AMENDED COMPLAINT FOR
DECLARATORY AND INJUNCTIVE RELIEF - 40

COLUMBIA LEGAL SERVICES
6 South Second Street, Suite 600
Yakima, WA 98901
(509) 575-5593

conduct wage survey that was likely to result in 5 percent wage cut for farmworkers constituted irreparable harm in the form of economic hardship).

## VI.    CAUSES OF ACTION

### FIRST CLAIM FOR RELIEF

(Administrative Procedures Act – Without Observance of Procedure Required by Law – 5 U.S.C. § 706(2)(D))

144.    The APA provides that courts must "hold unlawful and set aside agency action" that is "without observance of procedure required by law." 5 U.S.C. § 706(2)(D).

145.    The APA requires agencies to publish notice of all proposed rulemaking in a manner that "give[s] interested persons an opportunity to participate in the rule making through submission of written data, views, or arguments . . . ." 5 U.S.C. § 553(c).

146.    USDOL never published notice of the change in its prevailing wage methodology, which interjects the guaranteed wage concept into the wage finding process, including in its July 26, 2019 NPRM, thereby denying Plaintiffs and other affected parties an opportunity to present comment and evidence, in violation of 5 U.S.C. § 706(2)(D).

147.    USDOL's prevailing wage methodology change was not an "interpretative rule[], general statement[] of policy, or rule[] of agency organization, procedure, or practice." 5 U.S.C. § 553(b). To the contrary, it was a

FIRST AMENDED COMPLAINT FOR
DECLARATORY AND INJUNCTIVE RELIEF - 41

COLUMBIA LEGAL SERVICES
6 South Second Street, Suite 600
Yakima, WA 98901
(509) 575-5593

substantive rule change that fundamentally altered Plaintiffs' rights and employers' obligations under federal law.

148.   Defendants' violations cause ongoing harm to Plaintiffs.

### SECOND CLAIM FOR RELIEF
(Administrative Procedure Act – Arbitrary and Capricious –
5 U.S.C § 706(2)(A))

149.   Under the APA, a court must set "aside agency action" that is "arbitrary and capricious." 5 U.S.C. § 706(2)(A).

150.   Under the INA, in its administration of the H-2A program, the USDOL has a statutory duty to prevent adverse effects to the wages of U.S. workers.

151.   USDOL acknowledges that prevailing wage surveys are most useful to protect the wages of U.S. workers where employers commonly pay based on a piece rate and when State agencies know based on past experience that prevailing wages are higher than the AEWR. *See* 84 Fed. Reg. 36168, 36180 (Jul. 26, 2019).

152.   The change in USDOL's the prevailing wage methodology, which interjects the guaranteed wage concept into the wage finding process, violates USDOL's statutory obligation to protect the wages of U.S. farmworkers against adverse effects from the employment of H-2A foreign workers.

153.   USDOL has failed to explain its departure from its longstanding policy which does not provide for the use of the "hourly wage guarantee" in

FIRST AMENDED COMPLAINT FOR
DECLARATORY AND INJUNCTIVE RELIEF - 42

COLUMBIA LEGAL SERVICES
6 South Second Street, Suite 600
Yakima, WA 98901
(509) 575-5593

making prevailing wage findings. *See* Bueno Decl., Ex. 2 at 108-09 (Handbook No. 385 does not include the hourly wage guarantee concept in the prevailing wage rate finding instructions).

154.    USDOL's change in policy and practice is also irrational because it interjects the hourly wage guarantee concept, which is already guaranteed by law (e.g. state minimum wage or the federal AEWR), into the wage finding process without defining what the SWA or employers are being asked to report on or include, and results in higher piece-rate wages being eliminated when piece rates are, in fact, the prevailing wage in the industry.

155.    USDOL's failure to use the worker surveys confirming the predominance of piece-rate pay is arbitrary and capricious. The Handbook No. 385 provides: "Data supplied by employers **must** be verified through worker interviews." Bueno Decl., Ex. 2 at 108 (I-116) (emphasis added). It is irrational to go through the process and expense of a worker survey, only to completely disregard the results which contravene employers' assertions of paying an hourly rate for harvest work.

156.    USDOL's insistence on requiring a sample size threshold of 15 percent is arbitrary and capricious. The Handbook No. 385 provides that threshold as a "general guide [that] should be observed . . . ." *Id.* at 106 (I-114). By making that threshold mandatory, employers have an incentive not to participate in the

FIRST AMENDED COMPLAINT FOR
DECLARATORY AND INJUNCTIVE RELIEF - 43

survey process and valuable data, corroborated by worker surveys, is not considered, thereby eliminating higher prevailing piece-rate wages.

157.    Finally, the change in the hourly wage guarantee policy and practice, the failure to use worker surveys to verify employer data, and the disregard of employer wage data below the 15 percent threshold, are arbitrary and capricious because these actions fail to protect the wages of U.S. farmworkers, the central purpose of setting prevailing wages.  Despite the widely accepted understanding that Washington farmworkers earn more than minimum wages when working by the piece rate in tree fruit harvest, USDOL's actions result in the elimination of these higher wages.

158.    USDOL's actions are therefore "arbitrary and capricious" and in violation of the APA. 5 U.S.C. § 706(2)(A).

159.    Defendants' violation causes ongoing harm to Plaintiffs.

## VII.   REQUEST FOR RELIEF

Plaintiffs ask this Court to grant them the following relief:

1.      Declare that Defendants failed to observe the procedure required by law when changing the prevailing wage methodology to interject the hourly wage guarantee concept into the wage finding process, in violation of 5 U.S.C. § 706(2)(D);

FIRST AMENDED COMPLAINT FOR
DECLARATORY AND INJUNCTIVE RELIEF - 44

COLUMBIA LEGAL SERVICES
6 South Second Street, Suite 600
Yakima, WA 98901
(509) 575-5593

2.      In the alternative, declare that the change in prevailing wage methodology which interjects the guaranteed hourly wage concept into the wage finding process is arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law within the meaning of 5 U.S.C. § 706(2)(A);

3.      Declare that the failure to use the worker survey to verify the data provided by employers is arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law within the meaning of 5 U.S.C. § 706(2)(A);

4.      Declare that mandating a 15 percent sample size threshold for harvest activities traditionally paid by the piece rate and corroborated by worker surveys is arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law within the meaning of 5 U.S.C. § 706(2)(A);

5.      Enjoin the Defendants from interjecting the hourly wage guarantee concept into the wage finding process, prohibiting its use for the 2020 Wage Survey, and to instruct ESD accordingly;

6.      Enjoin the Defendants and all its officers, employees, and agents, and anyone acting in concert with them, from accepting, certifying and posting in the electronic job registry any H-2A job order, including authorizing access to the interstate clearance system without requiring the employer to include a five percent wage increase for all piece-rate activities pursuant to 20 C.F.R §§ 655.100,

FIRST AMENDED COMPLAINT FOR
DECLARATORY AND INJUNCTIVE RELIEF - 45

COLUMBIA LEGAL SERVICES
6 South Second Street, Suite 600
Yakima, WA 98901
(509) 575-5593

655.120, 655.143, 655.144, 655.150 and 655.161, until a prevailing wage survey that complies with federal law is completed in Washington State;

7.      Enjoin the Defendants from permitting the H-2A system to adversely affect the wages of Washington farmworkers and order Defendants to preserve the status quo and rights of U.S. workers by providing notice to all H-2A employers in Washington State, pursuant to 20 C.F.R. § 655.120(b), that each employer must immediately pay all workers employed under H-2A job orders a five percent wage increase for all piece-rate activities and continue to pay that increase until a prevailing wage survey that complies with federal law has been completed in Washington State;

8.      In the alternative, order Defendants to preserve the status quo and rights of U.S. workers by providing notice to all employers in Washington State using H-2A contracts that have been certified or will be certified for work to be performed in 2021 that piece-rate wages may increase pending the outcome of this litigation;

9.      Award Plaintiffs their reasonable fees, costs and expenses, including attorneys' fees, pursuant to the Equal Access to Justice Act (EAJA), 28 U.S.C. § 2412;

10.     Grant other further relief as just and appropriate.

FIRST AMENDED COMPLAINT FOR
DECLARATORY AND INJUNCTIVE RELIEF - 46

COLUMBIA LEGAL SERVICES
6 South Second Street, Suite 600
Yakima, WA 98901
(509) 575-5593

DATED this 4th day of January, 2021.

COLUMBIA LEGAL SERVICES

BARNARD IGLITZIN & LAVITT LLP

s/Lori Jordan Isley
Lori Jordan Isley, WSBA #21724
Blanca E. Rodriguez, WSBA #27745
Andrea Schmitt, WSBA # 39759
Hannah Woerner, WSBA #53383
6 South 2nd Street, Suite 600
Yakima, WA 98901
Phone: (509) 575-5593, x. 217
Fax: (509) 575-4404
E-mail: lori.isley@columbialegal.org;
blanca.rodriguez@columbialegal.org;
andrea.schmitt@columbialegal.org;
hannah.woerner@columbialegal.org

s/Kathleen Phair Barnard
Kathleen Phair Barnard, WSBA #17896
18 West Mercer Street, Ste. 400
Seattle, WA 98119-3971
Phone: (206) 285-2828
Fax: (206) 378-4132 (fax)
E-mail: barnard@workerlaw.com

FIRST AMENDED COMPLAINT FOR
DECLARATORY AND INJUNCTIVE RELIEF - 47

COLUMBIA LEGAL SERVICES
6 South Second Street, Suite 600
Yakima, WA 98901
(509) 575-5593

CERTIFICATE OF SERVICE

I hereby certify that on this 4th day of January, 2021, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following:

| | |
|---|---|
| Lori Jordan Isley | lori.isley@columbialegal.org, cheli.bueno@columbialegal.org, |
| Blanca Rodriguez | blanca.rodriguez@columbialegal.org |
| Andrea Schmitt | andrea.schmitt@columbialegal.org |
| Hannah Woerner | hannah.woerner@columbialegal.org |
| John T Drake | john.drake2@usdoj.gov, mary.f.buhl@usdoj.gov, nancy.kidwell@usdoj.gov, |

And I hereby certify that I have mailed by United States Postal Service the document to the following non-CM/ECF participants:  None.

_Arasele Bueno_
Arasele Bueno

FIRST AMENDED COMPLAINT FOR
DECLARATORY AND INJUNCTIVE RELIEF - 48

COLUMBIA LEGAL SERVICES
6 South Second Street, Suite 600
Yakima, WA 98901
(509) 575-5593