William D. Hyslop
United States Attorney
Eastern District of Washington
John T. Drake
Jessica A. Pilgrim
Assistant United States Attorneys
Post Office Box 1494
Spokane, WA 99210-1494
Telephone: (509) 353-2767

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF WASHINGTON

RAMON TORRES HERNANDES, and
FAMILIAS UNIDAS POR LA
JUSTICIA, AFL-CIO, a labor
organization,

                                Plaintiffs,

                v.

UNITED STATES DEPARTMENT OF
LABOR and MILTON AL STEWART,
in his official capacity as United States
Secretary of Labor,[1]

                                Defendants.

No. 1:20-CV-03241-SMJ

DEFENDANTS' RESPONSE TO
PLAINTIFFS' REVISED MOTION
FOR PRELIMINARY INJUNCTION

    The United States Department of Labor Defendants ("DOL"), through counsel,

submit the following response to Plaintiffs' Revised Motion for Preliminary Injunction

(ECF No. 19).

---

[1] On January 20, 2021, Milton Al Stewart assumed duties as the Acting Secretary of

Labor, automatically substituting for Defendant Eugene Scalia, former Secretary, as a

party in accordance with Federal Rule of Civil Procedure 25(d).

RESPONSE TO PLAINTIFFS' REVISED MOTION FOR PRELIMINARY INJUNCTION - 1

# I.    INTRODUCTION

Plaintiffs urge the Court to enter a sweeping injunction that would require DOL to set aside at least 11 prevailing wage rates ("PWRs") for the 2021 harvest season. In support of that request, Plaintiffs claim that DOL's prevailing wage finding process "eliminated" piece rate wages for harvesting work, thereby depriving farmworkers of what Plaintiffs consider to be higher-paying wages.

Respectfully, Plaintiffs are mistaken.  The premise of their argument—that piece rate wages were eliminated—is demonstrably false.  As in prior years, some harvesting PWRs were validated as piece rate wages, and others were validated as hourly wages.  Contrary to Plaintiffs' assertions, the PWRs that were validated as hourly wages *were not influenced* by the inclusion of minimum wage guarantees in the wage finding process.  A modified analysis of the data shows that all harvesting PWRs *remain at hourly wages* even when minimum wage guarantees are ignored.

At the end of the day, Plaintiffs are asking the Court to ignore the survey data and award them more "equitable" pay.  The Court should not oblige.  DOL is charged with ascertaining the *prevailing* wage being paid on the open labor market.  And that is exactly what DOL did.  The data show that employers are predominantly paying hourly wages for the harvesting activities at issue.  Plaintiffs may not like the fact that employers have increasingly gone away from piece rates for those activities, but their grievance lies with the employers, not DOL.

## II.    OVERVIEW OF H-2A PROGRAM AND WAGE SURVEY PROCESS

Because this Court is already familiar with the H-2A visa program and the process by which state workforce agencies and the Department of Labor arrive at PWRs, DOL provides only a brief summary here, focusing on the concepts most germane to the issues raised in the instant motion.  A more thorough explanation can be found in the declaration filed at ECF No. 20-4.

### A. H-2A Program Requirements and Wage Rates

The H-2A visa program allows employers to hire foreign agricultural workers to perform temporary or seasonal labor in the United States.  Because the hiring of foreign workers has the potential to weaken the market for domestic labor, DOL takes measures to ensure that the "wages and working conditions of workers in the United States similarly employed" will not be "adversely affect[ed]."  8 U.S.C. § 1188(a)(1)(B).  The protective measure that is most relevant for present purposes is the requirement that H-2A employers offer, advertise in their recruitment, and pay their H-2Aforeign workers, and others who perform the same work, the highest of the available wage sources listed in 20 C.F.R. § 655.120(a): (1) the Adverse Effect Wage Rate ("AEWR"), (2) the prevailing hourly wage or piece rate, (3) a collectively bargained wage, or (4) the Federal or State minimum wage.  *See also* 20 C.F.R. § 655.122(a).

This case implicates the correlation between the AEWR, the PWR, and the state minimum wage.  Put simply, the AEWR is the rate DOL has determined is necessary

to ensure the employment of H-2A workers will not adversely effect the wages of workers in the United States similarly employed and, to fulfill DOL's statutory mandate under 8 U.S.C. 1188(a)(1), operates as a "wage floor" below which wages of U.S. and foreign workers cannot be negotiated. *Temporary Agricultural Employment of H-2A Aliens in the United States*, 75 Fed. Reg. 6884, 6891 (Feb. 12, 2010) ("2010 Rule"); *Adverse Effect Wage Rate Methodology for the Temporary Employment of H-2A Nonimmigrants in Non-Range Occupations in the United States*, 85 Fed. Reg. 70445, 70450 (Nov. 5, 2020) ("2020 AEWR Rule"). The PWR is the wage for a crop or agricultural activity that is found to be "prevailing" in a geographic area based on surveys of agricultural employers in that area. 2020 AEWR Rule, 85 Fed. Reg. at 70450 ("The AEWR is complemented by the prevailing wage determination process, which serves a related, but distinct purpose. The prevailing wage, as determined under current Departmental guidance, provides an additional safeguard against wage depression in local areas and agricultural activities.").

**B. Employer Surveys Conducted by ESD**

DOL sets PWRs based on survey data gathered from employers. The surveys are conducted by state workforce agencies ("SWAs") under guidelines published by DOL in a document known as "ETA Handbook 385" and subsequent guidance, including guidance letters known as "TEGLs." In Washington State, the employer survey is conducted by the Washington Employment Security Department ("ESD").

ESD has discretion, based on its experience and knowledge of local job markets, to design and conduct the surveys in a manner that will yield accurate data within the parameters established by DOL.  For example, ESD has discretion to decide which crops and agricultural activities to survey, the scope of the geographic area to be surveyed, when to conduct the surveys, the methods to be used in collecting wage data, and whether to interview workers in addition to employers.

ESD submits the results of its surveys to DOL's Office of Foreign Labor Certification ("OFLC").  The results are submitted in summary fashion on a form known as Form ETA-232, which is typically accompanied by a Microsoft Excel spreadsheet that provides a more detailed overview of the data.  There is one Form ETA-232 submitted for each crop activity that meets the requirements for validation of a PWR.

**C. Validation of PWRs by DOL**

Upon receipt of the Form ETA-232s and accompanying spreadsheets from ESD, the National Prevailing Wage Center ("NPWC"), within OFLC begins processing and validating the data.  Two steps in NPWC's validation process are relevant to Plaintiffs' motion: the verification of sample sizes and the application of the 40 and 51 percent rules.

1. Verification of Sample Sizes

NPWC first confirms that the sample size thresholds in Handbook 385 are satisfied.  This is done by dividing the number of workers represented in the sample

by the number of workers in the total population for the activity in question.  If the

resulting percentage meets or exceeds the threshold specified in Handbook 385, the

validation process continues; if not, the process stops and no PWR is validated for that

activity.  In close cases, when the percentage would meet the threshold if rounded to

the nearest whole number (*e.g.*, 14.5% rounded up to 15%), the validation process

continues.  ECF No. 20-4 at ¶¶ 19–22.

    2.  Application of 40 Percent Rule and 51 Percent Rule

    NPWC then proceeds to apply the "40 Percent Rule" and the "51 Percent Rule."

These rules are set forth in Handbook 385 as follows:

    a.  40 percent rule. A single rate or schedule which–accounts for the
        wages paid to 40 percent or more of the domestic seasonal workers in
        a single crop activity is the prevailing rate. If there are two such rates
        or schedules, the one accounting for the greater number of domestic
        seasonal workers becomes the prevailing rate. If two rates or
        schedules are being paid to the same number of workers and each rate
        accounts for at least 40 percent of the workers, then both rates or
        schedules are prevailing.

    b.  51 percent rule. If no single rate or schedule accounts for 40 percent
        or more of the workers and the rates are all in the same unit of
        payment (e.g., per hour, per lb.), array the rates in descending order
        and then count the cumulative number of workers, starting with the
        lowest in the array, until 51 percent of the workers covered in the
        survey are included.  The rate reached at this point is the prevailing
        wage rate. (Rates such as per bushel and per 1 1/4 bushel box
        represent different units of payments).

    c.  More than one unit of payment. If no single rate is being paid to at
        least 40 percent of the workers in a single crop activity and there is
        more than one unit of payment, such as 1 bushel and 1 1/8 bushels,
        determine the unit which is applicable to the largest number of
        workers. Using this unit of payment, determine the prevailing rate in
        accordance with (a) or (b) above. . . .

ECF No. 6-2 at 6–7 of 26 (Handbook 385 at I-116–17).

### III.   APA STANDARD OF REVIEW

A court reviews an administrative agency's final decision under the

Administrative Procedure Act ("APA").  5 U.S.C. §§ 701-706.  The APA imposes a

deferential standard of review, which is limited to a determination of whether the

agency acted in a manner that was "arbitrary, capricious, an abuse of discretion, or

otherwise not in accordance with law."  *Forest Guardians v. U.S. Forest Serv.*, 495

F.3d 1162, 1168 (10th Cir. 2007) (citing 5 U.S.C. § 706(2)(A)).  Under this standard,

courts "do not substitute [their] judgment for that of the agency.'"  *Earth Island Inst.*

*v. U.S. Forest Serv.*, 697 F.3d 1010, 1013 (9th Cir. 2012).  Deference owed to an

agency's decision "is highest when reviewing an agency's technical analyses and

judgments involving the evaluation of complex scientific data within the agency's

technical expertise."  *League of Wilderness Defenders Blue Mountains Biodiversity*

*Project v. Allen*, 615 F.3d 1122, 1130 (9th Cir. 2010), *overruled on other grounds*,

*Am. Trucking Ass'n, Inc. v. City of Los Angeles*, 559 F.3d 1046, 1052 (9th Cir. 2009).

The APA directs courts to "review the whole record or those parts of it cited by

a party . . ."  5 U.S.C. § 706.  Thus, a court's review is limited to the administrative

record before the agency decision-maker.  *See Fla. Power & Light Co. v. Lorion*, 470

U.S. 729, 743 (1985).  A decision should only be reversed as arbitrary and capricious

when the agency "relied on factors Congress did not intend it to consider, entirely

failed to consider an important aspect of the problem, or offered an explanation that runs counter to the evidence before the agency or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Lands Council v. McNair*, 537 F.3d 981, 987 (9th Cir. 2008) (en banc) (internal quotations omitted).

## IV.    PRELIMINARY INJUNCTION STANDARD

A preliminary injunction is an "extraordinary" remedy that is reserved for exceptional cases. *Winter v. Natural Res. Defense Council, Inc.*, 555 U.S. 7, 22 (2008). A plaintiff seeking a preliminary injunction must demonstrate (1) that it is likely to succeed on the merits of its claims; (2) that it is likely to suffer irreparable harm if injunctive relief is not granted; (3) that a balancing of the equities tips in its favor; and (4) that granting injunctive relief would be in the public interest. *Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1131 (9th Cir. 2011). The plaintiff must make a "clear showing" on each factor. *Winter*, 555 U.S. at 22; *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (preliminary injunction must not be granted "unless the movant, *by a clear showing*, carries the burden of persuasion") (emphasis in original).

Alternatively, a plaintiff may obtain preliminary injunctive relief by raising "serious questions" going to the merits, and showing that a balancing of the hardships tips "sharply" in its favor. *Cottrell*, 632 F.3d at 1135. This alternative approach does not eliminate the remaining factors; the plaintiff must still demonstrate a likelihood of irreparable harm and that an injunction is in the public interest. *Id.*

Preliminary injunctions are typically reserved for preserving the status quo pending a determination on the merits. *Chalk v. U.S. District Court*, 840 F.2d 701, 704 (9th Cir. 1988). Where, as here, a plaintiff seeks a preliminary injunction that goes beyond the status quo and "orders a responsible party to take action,"—called a mandatory injunction—the plaintiff bears an even heavier burden. *Meghrig v. KFC W., Inc.*, 516 U.S. 479, 484 (1996). Because mandatory injunctions are especially disfavored, *Martinez v. Mathews*, 544 F.2d 1233, 1243 (5th Cir. 1976), the plaintiff must meet a "doubly demanding" standard: "that the law and facts *clearly favor* her position, not simply that she is likely to succeed." *Garcia v. Google, Inc.*, 786 F.3d 733, 740 (9th Cir. 2015) (emphasis in original).

## V.    ARGUMENT

Plaintiffs are pursuing two claims under the APA. The first is that DOL failed to engage in notice and comment rulemaking before it supposedly "injected" hourly guarantees into the prevailing wage finding process. The second is that DOL acted arbitrarily and capriciously in validating certain harvesting PWRs as hourly wages rather than piece rate wages.[2]

For the reasons discussed below, Plaintiffs are not entitled to preliminary relief. Plaintiffs lack Article III standing, are not likely to prevail on the merits, and have failed to establish irreparable harm that is causally related to DOL's alleged conduct.

---

[2] A complete list of the PWRs for the 2021 season is attached hereto as **Appendix A**.

**A. Plaintiffs lack Article III standing because they have failed to establish a concrete and particularized injury tied to the challenged PWRs.**

Standing is an "irreducible constitutional minimum" for litigating claims in federal court. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992). To establish standing, a plaintiff must show (1) an injury in fact that is concrete and particularized; (2) a causal link between the alleged injury and the defendant's alleged conduct; and (3) a likelihood that the injury can be remedied by a favorable decision. *Id.* at 560–61. When the plaintiff is an organization bringing claims on behalf of its members, it must demonstrate that "(a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purposes; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Am. Diabetes Ass'n v. United States Dep't of the Army*, 938 F.3d 1147, 1155 (9th Cir. 2019).

Because Plaintiff Torres and Plaintiff FUJ's members are not H-2A workers, the PWRs at issue do not directly apply to them.[3] Plaintiffs therefore lack a concrete and particularized injury that can be directly tied to the PWRs. Accordingly, Plaintiffs

---

[3] The PWRs would directly apply to Plaintiffs if they went to work for an H-2A employer and performed the same work as H-2A workers. 20 C.F.R. §§ 655.103(b); 655.122(a) ("corresponding employment" rule). But Plaintiff Torres does *not* intend to work for an H-2A employer in the upcoming harvest, ECF No. 4 at ¶¶ 10-11, 14, and FUJ has not made a particularized showing that any of its members will do so.

must show that they will be *indirectly* injured.  In a nutshell, Plaintiffs must establish that the challenged PWRs will depress the wages of *all* farmworkers in Washington, both H-2A and domestic.  Stated differently, Plaintiffs must show that the challenged PWRs will prompt *non-H-2A* employers to pay lower wages to *domestic* workers, resulting in a market-wide depression of wages.

 A market-wide depression of wages, while theoretically possible, is not a foregone conclusion.  As a threshold matter, the hourly-wage PWRs at issue are not necessarily "lower" wages.  Plaintiffs insist that they would earn more money if they were paid by the piece rate, but that claim is overstated.  Because a worker's ability to earn more money when paid by the piece rate depends on a variety of factors—the worker's effort level, the worker's experience, the crop yield in a particular orchard, and the type of harvesting being performed, just to name a few—all that can be said is that *some* workers might earn more money under *some* conditions.

Moreover, as explained above, the AEWR serves as a "wage floor" that prevents adverse effects on domestic workers' wages.  Therefore, if Plaintiffs are to establish an injury-in-fact that is causally related to the publication of the challenged PWRs, they will need to show that the AEWR for the 2021 harvest season—which, at $15.83 per hour currently, is considerably higher than the challenged PWRs—is not sufficient to protect against adverse effects on the wages of domestic workers.

Plaintiffs have not accounted for these critical variables.  Unless and until they do, they will lack Article III standing for lack of a concrete and particularized injury.

**B. Plaintiffs are not likely to prevail on their claim that DOL was required to engage in notice and comment rulemaking.**

Plaintiffs argue that DOL violated the APA by failing to engage in notice and comment rulemaking before allowing hourly guarantees to be included in the wage finding process. ECF No. 19 at 10–13. Plaintiffs insist that notice and comment was required because the inclusion of hourly guarantees was a "change" in DOL's practice that caused piece rate wages to be "eliminated." ECF No. 19 at 12.

This argument is unavailing. First, the premise of the argument—that including hourly guarantees caused piece rate wages to be eliminated—is false. It bears noting that when Plaintiffs originally filed for preliminary injunctive relief, they alleged that hourly guarantees caused piece rates to be eliminated for "*almost all* cherry, pear and apple harvest activities." ECF No. 1 at ¶ 60 (emphasis added); *see also* ECF No. 3 at 7 (alleging "wholesale elimination" of piece rates). Now, in their "revised" motion, Plaintiffs suggest that only *three* activities were impacted. ECF No. 19 at 10, 15.

As Plaintiffs have belatedly recognized, there were 6 activities for which PWRs were certified as a piece rate wage, despite the fact that some employers reported paying piece rates with an hourly guarantee for those activities. Gotte Decl. ¶ 38. That is prima facie evidence that hourly guarantees do not "eliminate" piece rates. With regard to the 11 activities for which PWRs were validated as an *hourly* wage, Plaintiffs now concede that 6 were not impacted by the inclusion of hourly guarantees. *See* ECF No. 19 at 10 n. 5 (Plaintiffs striking prior allegations that Braeburn apples,

Gala apples, dark red cherries, Lapin cherries, and Bosc pears were impacted). And, as explained in Section V.C.2 below, the other 5 activities were not impacted, either. Accordingly, the notice and comment claim fails out of the gate because the alleged "elimination" of piece rate wages did not in fact occur.[4]

Second, the inclusion of hourly guarantees was not a "change" in DOL's practice. Indeed, DOL has allowed earnings guarantees like hourly guarantees to be included in the wage finding process since Handbook 385 was published in 1981. The applicable guidance states that a piece rate *with* an earnings guarantee is a different method of payment than a piece rate *without* an earnings guarantee, and should be listed separately when reporting prevailing wage findings to DOL:

> List each different rate paid to hired workers covered in the survey in descending order and grouped by method of pay. . . . *Rates with [an] earnings guarantee represent a different method of payment from piece rates without earnings guarantees*, and should be listed separately [on the Form ETA-232].

Handbook 385 at I-141 (emphasis added); *see also* Gotte Decl. ¶ 39, Ex. D (same guidance incorporated into Form ETA-232).

Third, even if this were a change in DOL's practice, notice and comment was not required. As this Court has previously recognized, DOL's guidance about how the

---

[4] The fact that piece rate wages have not been "eliminated" as Plaintiffs claim is similarly fatal to their argument that "working conditions" have been adversely affected. ECF No. 19 at 19-21.

wage finding process should be conducted is not legislative in nature. *See Zirkle Fruit Co. v. United States Dep't of Labor*, 442 F. Supp. 3d 1366, 1376 (E.D. Wash. 2020) ("The Court concludes Handbook 385 is a statement of agency practice or procedure, and not a legislative rule."). Any change to such guidance does not require notice and comment. *See Perez v. Mortg. Bankers Ass'n*, 575 U.S. 92, 101 (2015) ("Because an agency is not required to use notice-and-comment procedures to issue an initial [non-legislative] rule, it is also not required to use those procedures when it amends or repeals that [non-legislative] rule."). *Id.*

Finally, to the extent Plaintiffs are claiming that the notice and comment requirement was triggered when ESD started asking employers to report hourly guarantees on its wage survey in 2016, they are equally mistaken. As noted above, Handbook 385 has always allowed SWAs to ask about hourly guarantees. All that happened in 2016 was that ESD began incorporating that guidance into its wage survey. That was not a change in *DOL's* practice or procedure, and thus could not have triggered a notice and comment requirement.

**C. Plaintiffs are not likely to prevail on their claim that DOL's validation of the PWRs for the upcoming harvest season was arbitrary and capricious.**

Plaintiffs contend that DOL acted arbitrarily and capriciously in three ways: first, by treating the sample size thresholds in Handbook 385 as firm requirements rather than flexible guidelines; second, by accounting for hourly guarantees in the prevailing wage finding process; and third, by allegedly "toss[ing] aside" worker

RESPONSE TO PLAINTIFFS' REVISED MOTION FOR PRELIMINARY INJUNCTION - 14

survey data that, in Plaintiffs' view, "overwhelmingly indicates" that piece rates are the prevailing method of payment for all harvesting activities.  ECF No. 19 at 1, 3. Each of these claims is addressed below.

1. DOL's practice of adhering to reasonable sample size thresholds in Handbook 385 is not arbitrary and capricious.

The crux of Plaintiffs' argument on the sample size issue is that DOL should certify a prevailing wage whenever a sample size is "close enough" to the applicable threshold.  *See* ECF No. 19 at 17 ("USDOL has discretion to make wage findings even where sample sizes are below 15 percent because the thresholds in the Handbook provide a 'general guide.'").

The Court should reject this argument.  As DOL explained in the Evans Fruit litigation in 2019, its consistent practice has been to treat the sample size thresholds in Handbook 385 as necessary to ensure valid survey results.  ECF No. 20-4 at ¶¶ 19–22. In reviewing ESD's survey results, DOL divides the number of workers in the sample by the number of workers in the total population.  *Id.*  If the resulting percentage meets or exceeds the threshold specified in Handbook 385, DOL deems the sample sufficiently representative and proceeds to validate a PWR.  *Id.*  If the percentage falls below the threshold, DOL does not validate a PWR.  *Id.*  In close cases, when the calculation would meet the threshold if rounded to the nearest whole number (*e.g.*, 14.5% rounded up to 15%), DOL proceeds to validate the PWR.  *Id.*

DOL does not act arbitrarily and capriciously by ensuring methodological consistency in the survey results that it validates.  Applying the sample size thresholds consistently ensures accuracy and facilitates programmatic administrability.  If DOL were to instead apply the thresholds as flexible guidelines—or to abandon them altogether—it would be forced to make subjective, one-off decisions that, in the absence of additional reasoned guidance, have the potential to undermine the integrity of the wage finding process.  Going that route would also subject DOL to endless "sample size" litigation.  Plaintiffs' motion provides a preview of what that would mean: Courts would be forced to assess whether a sample size in a given survey were statistically adequate, a moving target that would fluctuate and be subject to second-guessing.  *See* ECF No. 19 at 19 (urging Court to approve thresholds that "ranged from 10.74 to 13.39 percent").

Plaintiffs are correct that there are two harvesting activities that *do* meet the sample size thresholds when fractional percentages are rounded: apples and Red Delicious apples.  DOL has identified two more activities that meet the thresholds with rounding (Cripps Pink apples, thinning and Red Delicious apples, thinning), and has validated PWRs for all four activities.

   2. The inclusion of hourly guarantees in the wage finding process is not arbitrary and capricious.

The inclusion of hourly guarantees in the wage finding process is not arbitrary and capricious.  Employers routinely report paying hourly guarantees on the wage

survey, and ESD and DOL are therefore justified in accounting for them.  Moreover, to the extent *minimum wage* guarantees could theoretically influence the wage finding process, there is no cause for concern because the challenged PWRs remain at hourly wages (not piece rates) even when minimum wage guarantees are ignored.

> i.  *Washington employers routinely report paying hourly guarantees*.

Plaintiffs argue that hourly guarantees should not be included in the wage finding process because they are "not in common usage in Washington State."  ECF No. 19 at 13 n. 6; *see also* ECF No. 14 at 22 n. 8 (alleging that hourly guarantees "are not a common or regular practice," and questioning whether they are "actually used").

Contrary to Plaintiffs' assertions, hourly guarantees *are* in common usage. Washington employers routinely report paying piece rates with an hourly guarantee on ESD's wage survey.  Indeed, there were piece rates with an hourly guarantee reported for *all 17 of the harvesting activities* in Washington for which NPWC validated a PWR in January 2021.  Gotte Decl. at ¶ 38.

Moreover, only a fraction of the hourly guarantees that were reported were "minimum wage" guarantees.  For Skeena cherries, there were 7 unique hourly guarantees above the state minimum wage: $12.50, $13.00, $13.50, $14.00, $15.00, $15.03, and $20.00.  Gotte Decl., Ex. A.  Those guarantees accounted for 48.28% of all reported guarantees by employment.  *Id.*  For yellow cherries, there were 14 unique hourly guarantees above the state minimum wage: $12.50, $13.00, $13.25, $13.50, $14.00, $14.25, $14.32, $14.50, 15.00, $15.03, $15.25, $18.00, $20.00, and $22.00.

*Id.* at Ex. B.  Those guarantees accounted for 55.27% of all reported guarantees.  *Id.*

For berries, there were 5 unique hourly guarantees above the state minimum wage:

$12.50, $13.00, $14.00, $15.00, and $15.03.  *Id.* at Ex. C.  Those guarantees

accounted for 45.84% of all reported guarantees.  *Id.*

      The fact that employers are actually paying non-minimum wage guarantees

refutes any claim that it is arbitrary and capricious to include hourly guarantees in the

wage finding process.  Indeed, given the reported prevalence of this practice among

Washington employers, it would be arbitrary and capricious *not* to do so.

      *ii.  Minimum wage guarantees did not impact the challenged PWRs.*

      Plaintiffs' main claim is that hourly guarantees—and more particularly,

*minimum wage* guarantees—caused the PWRs for Skeena cherries, yellow cherries,

and berries to be validated as hourly wages when they should have been validated as

piece rates.  The crux of this claim is that DOL improperly classified piece rates with

hourly guarantees at or below the state minimum wage as a different unit of payment

than piece rates without an hourly guarantee.  ECF No. 19 at 16.  Because employers

are required to pay at least state minimum wage regardless of any guarantee, Plaintiffs

argue, the better practice would be to group piece rates with guarantees at or below the

minimum wage together with ordinary piece rates without a guarantee, such that the

minimum wage guarantee is effectively ignored.  ECF No. 14 at ¶¶ 70, 111.

      To their credit, Plaintiffs have raised an interesting point.  Employers that

offer hourly guarantees that are equal to the state minimum wage are arguably doing

no more than what the law already requires of every employer in the state.  For that reason, a case could be made that piece rates with a minimum wage guarantee are conceptually no different from piece rates with no hourly guarantee, and thus should not be treated as separate units of payment in the wage finding process.

Ultimately, however, this issue is completely academic.  That is because the challenged PWRs remain at hourly wages (not piece rates), even when minimum wage guarantees are ignored:

- The PWR for **Skeena cherry** harvesting was validated under the 40 percent rule within the hourly wage unit of payment.  The hourly wage unit of payment was found to be the prevailing unit of payment, and was thus the unit of payment within which the 40 percent rule was applied, because it accounted for the highest number of workers (5,740) across all units of payment.  As shown below, the hourly wage unit of payment would *still* account for the highest number of workers (and thus would *still* be the unit of payment within which the 40 percent rule would be applied) even if piece rates with minimum-wage guarantees are ignored:

| SKEENA CHERRIES – HARVESTING | | |
|---|---|---|
| Unit of Payment | Number of Workers (Original) | Number of Workers (Modified) |
| Hourly Wage (no bonus) | 5,740 | 5,740 |
| Per Pound with Hourly Guarantee (no bonus) | 5,520 | 2,608 |
| Per Pound no Hourly Guarantee (no bonus) | 1,799 | 4,711 |

- The PWR for **yellow cherry** harvesting was validated under the 40 percent rule within the hourly wage unit of payment.  The hourly wage unit of payment was found to be the prevailing unit of payment, and was thus the unit of payment within which the 40 percent rule was applied,

because it accounted for the highest number of workers (9,856) across all units of payment. As shown below, the hourly wage unit of payment would *still* account for the highest number of workers (and thus would *still* be the unit of payment within which the 40 percent rule would be applied) even if piece rates with minimum-wage guarantees are ignored:

| YELLOW CHERRIES – HARVESTING | | |
|---|---|---|
| Unit of Payment | Number of Workers (Original) | Number of Workers (Modified) |
| Hourly Wage (no bonus) | 9,856 | 9,856 |
| Per Pound with Hourly Guarantee (no bonus) | 9,800 | 5,323 |
| Per Pound no Hourly Guarantee (no bonus) | 3,136 | 7,561 |

- The PWR for **berry** harvesting was validated under the 40 percent rule within the hourly wage unit of payment. The hourly wage unit of payment was found to be the prevailing unit of payment, and was thus the unit of payment within which the 40 percent rule was applied, because it accounted for the highest number of workers (3,290) across all units of payment. As shown below, the hourly wage unit of payment would *still* account for the highest number of workers (and thus would *still* be the unit of payment within which the 40 percent rule would be applied) even if piece rates with minimum-wage guarantees are ignored:

| BERRIES – HARVESTING | | |
|---|---|---|
| Unit of Payment | Number of Workers (Original) | Number of Workers (Modified) |
| Hourly Wage (no bonus) | 3,290 | 3,290 |
| Per Pound with Hourly Guarantee (no bonus) | 3,109 | 1,245 |
| Per Pound no Hourly Guarantee (no bonus) | 406 | 2,270 |

RESPONSE TO PLAINTIFFS' REVISED MOTION FOR PRELIMINARY INJUNCTION - 20

Gotte Decl. at ¶¶ 14-36, Ex. A, B, C.

In short, nothing changes for the challenged PWRs when minimum-wage guarantees are ignored.[5]  Plaintiffs therefore have not shown a likelihood of success on their claim that DOL acted arbitrarily and capriciously in validating these PWRs.

It is unclear why Plaintiffs continue to insist that these PWRs were affected. Plaintiffs have had the survey data for months, *see* ECF No. 7 at ¶ 17, Ex. 10, and had ample opportunity to perform the calculations outlined above.  The explanation seems to be that Plaintiffs counted all hourly guarantees at or below the *AEWR*, rather than the state minimum wage, as "minimum wage" guarantees.  *See* ECF No. 21 at ¶¶ 4, 7–10 (data for employers that paid hourly guarantees "less than or equal to the AEWR").

That approach is improper.  First, the AEWR only applies to employers that employ H-2A workers.  Many of the employers that responded to the survey did *not* employ H-2A workers, and thus were not subject to the AEWR.  The fact that some of those employers paid hourly guarantees at or below the AEWR is irrelevant, because the AEWR did not apply to those employers.  By pegging the "minimum wage" to the AEWR, Plaintiffs improperly excluded many hourly guarantees that were actually

---

[5] DOL performed the same analysis for all other harvesting activities for which PWRs were validated as hourly wages (apples, Braeburn apples, Gala apples, Red Delicious apples, raspberries, dark red cherries, Lapin cherries, Bosc pears,).  Nothing changes for those activities, either.  Gotte Decl. ¶ 37.

RESPONSE TO PLAINTIFFS' REVISED MOTION FOR PRELIMINARY INJUNCTION - 21

paid by non-H-2A employers—*e.g.*, $12.50, $13.00, $13.25, $13.50, $14.00, $14.25,
$14.50, and $15.00. DOL's approach, which only excludes hourly guarantees at or
below the *state* minimum wage of $12.00 per hour, avoids that error.[6]

Second, the AEWR is fundamentally different from the state minimum wage. It
is true that H-2A employers are required to pay the AEWR if that wage is the highest
of several applicable wages (PWR, AEWR, state minimum wage, federal minimum
wage, or collectively bargained wage). However, unlike state minimum wages, which
apply to all employers across the board, the AEWR only applies to employers that
choose to participate in the H-2A program. These employers are effectively "opting
in" to paying at least the AEWR when they otherwise would not have to. Moreover,
the AEWR is often *higher* than state minimum wages. That has the effect of *raising*
wages for domestic workers who find work with an H-2A employer, who otherwise
would only be entitled to the lower state minimum wage. On the facts presented here,
domestic workers who go to work for an H-2A employer are paid a premium of more

---

[6] DOL excluded hourly guarantees *below* the state minimum wage to simplify the
analysis, even though Washington law allows agricultural employers to pay less than
the minimum wage in certain circumstances. *See* RCW 49.46.010(3)(a) (excluding
certain hand-harvest laborers from definition of "employee" under minimum wage
statute); *see also* Washington Department of Labor and Industries guidance available
here and here. DOL does not concede that those guarantees should be excluded.

RESPONSE TO PLAINTIFFS' REVISED MOTION FOR PRELIMINARY INJUNCTION - 22

than $3.00 per hour on top of the state minimum wage. That premium is properly counted as a "real" hourly guarantee for purposes of the wage finding process.

### iii. Plaintiffs' suggestions of employer manipulation are unsupported.

Plaintiffs suggest in passing that employers are conspiring to manipulate the prevailing wage finding process by falsely reporting that they paid hourly wages for harvesting activities. *See* ECF No. 19 at 3 ("Since at least 2015, the industry has endeavored to use the prevailing wage survey process to eliminate harvest piece-rate wages and replace them with hourly minimum wages. That campaign continues today."); ECF No. 14 at ¶ 49 (alleging "concerted campaign to eliminate prevailing piece-rate wage findings" on 2016 survey). The only support Plaintiffs offer for that eye-opening claim are statements allegedly made by the executive director of a special interest group back in 2015. ECF No. 14 at ¶¶ 49-51. But there is no evidence that those statements, which are not in the record, were intended to manipulate the wage finding process. Moreover, the statements are more than six years old. There is no evidence of anything similar occurring today.

To the extent the Court deems it relevant, there are perfectly legitimate explanations for why employers are increasingly paying hourly wages for certain harvesting activities. One explanation is quality control. Many crops are easily bruised when workers harvest them too hastily, (*e.g.*, yellow cherries, Honeycrisp apples, Bosc pears), and some employers have begun paying hourly wages rather than piece rates to encourage workers to take their time and be more careful. Walum Decl.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

¶ 4.  Another explanation is that paying piece rates has become too complicated for some employers in the wake of recent Washington Supreme Court rulings applying Washington's minimum wage laws.  *See, e.g.*, *Lopez Demetrio v. Sakuma Bros. Farms*, 183 Wn.2d 649, 656 (2015) (holding that piece-rate workers must be paid at least the state minimum wage for rest breaks); *Carranza v. Dovex Fruit Co.*, 190 Wn.2d 612, 614–15 (2018) (holding that piece-rate workers must by the hour for time spent on non-harvesting "downtime" activities).  As several commentators have observed, many employers seem to be responding by switching to a straight hourly wage in order to avoid the administrative burden of keeping track of the time workers spend on harvesting versus non-harvesting activities and paying separate wages for both.  Drake Decl., Ex. B, C.

       3.  Plaintiffs' reliance on ESD's worker survey data is misplaced.

Plaintiffs' newest theory, outlined in their amended complaint, is that DOL failed to "verify" the employer wage survey data by comparing it to ESD's worker survey data.  ECF No. 19 at 3, 6–10.  This argument is unavailing because (1) DOL no longer requires verification of employer reports through worker interviews; and (2) no meaningful comparison can be made because the worker data is incomplete, drawn from an unreliable sample, and incompatible with the employer data.

//

//

//

i. *DOL no longer requires verification of employer reports through worker interviews.*

Plaintiffs argue that Handbook 385 requires SWAs to verify employer wage reports through worker interviews, and that DOL "has not changed its policy" since Handbook 385 was published. ECF No. 19 at 8. Plaintiffs are mistaken.

Handbook 385 does state that wages reported by employers "must be verified through worker interviews." ECF No. 6-2 at 2 (Handbook 385 at I-116). But that requirement has been formally abolished. In 2013, DOL updated its ETA-232 and ETA-232A forms to reflect that SWAs were no longer required to conduct worker interviews. This change was implemented through notice and comment rulemaking under the Paperwork Reduction Act, with DOL explaining that the worker interview requirement had been rendered "obsolete":

> In Part II the Department is deleting the Worker Interviews columns (Column F and G) [of the Form ETA-232] because most states no longer conduct field surveys due to reduced funding. They are opting for mail, fax, or telephone surveys thereby making the worker interview process obsolete.

*   *   *

> The Department proposes to reorganize Section 5 of the [Form ETA-232A] and to eliminate the worker interviews column because most states no longer conduct field surveys due to reduced funding. They are opting for mail, fax, or telephone surveys thereby making the worker interview process obsolete.

Gotte Decl., ¶ 40, Ex. E; *see also* 78 Fed. Reg. 46373, 46373 (July 31, 2013) (notice of agency's intent to "streamline the information collection process by removing outdated questions" on Form ETA-232).

DOL's decision to eliminate the worker interview requirement was rational. The original intent of this requirement, as reflected in Handbook 385, was to have interviewers perform an immediate, on-site verification of the wages that particular employer was reporting.  After meeting with the employer, the interviewer was supposed to go out into the fields, interview a handful of workers, and verify that the same wages were being reported.  That procedure made sense back when surveys were conducted in person, because it was easy for interviewers to locate workers who could quickly confirm (or dispute) that the wages reported by the employer were correct.  When SWAs transitioned to conducting surveys by phone, mail, and email, however, it became much more difficult to interview workers.  Rather than simply going out into the fields after meeting with the employer, SWAs were forced to locate and interview workers through other means.  That translated to much higher survey administration costs, less reliable survey methodology, and other complications such as having to match workers with employers that responded to the survey.  DOL sensibly decided that the benefit of worker interviews was outweighed by the additional costs and complexities.

//

//

*ii.  ESD's worker survey data is incomplete, drawn from an unreliable sample, and incompatible with the employer survey data.*

Plaintiffs assign extraordinary significance to ESD's worker survey data, claiming that it "overwhelmingly indicate[s]" that piece rates are the "prevailing" wage for all harvesting activities.  ECF No. 19 at 3, 6–10.

Plaintiffs' reliance on the worker survey data is misplaced for a multitude of reasons.  First, ESD conducts the worker survey "for research purposes only."  Drake Decl., Ex. A.  Unlike the employer survey, ESD's worker survey was not designed to gather data that would be used in the prevailing wage finding process.  Indeed, ESD does not even submit the results of this survey to DOL.  ECF No. 6-1 at 78 of 93.

Second, ESD has not suggested that the worker data calls the employer data into question.  If ESD feels that there is a "glaring irregularity" as Plaintiffs suggest, ECF No. 19 at 8, ESD is free to say so.  DOL will not read a "glaring irregularity" into ESD's data when ESD itself has not done so.

Third, the worker survey data is incomplete.  Of the **17** harvesting activities for which a PWR was certified, only **8** are represented in the worker dataset: Braeburn apples, Cripps Pink apples, Gala apples, Granny Smith apples, Red Delicious apples, dark red cherries, red cherries and yellow cherries.  ECF No. 6-32 at 4 of 7.  There is no worker data for the **9** remaining activities: apples, berries, blueberries, raspberries, cherries, Lapin cherries, Skeena cherries, Sweetheart cherries, and Bosc pears.  The

fact that no worker data exists for more than half of the harvesting activities counsels strongly against making any type of comparisons between the two datasets.

Fourth, the sample sizes in the worker dataset are extremely small. Sample sizes ranged from **14** workers on the low end to **901** workers on the high end. Those numbers are dwarfed by the sample sizes in the employer dataset and the number of workers in the relevant populations:

| Harvesting Activity | Workers Represented in <u>Worker</u> Dataset | Workers Represented in <u>Employer</u> Dataset | Workers in Total Population |
|---|---|---|---|
| Apples, Braeburn | 14 | 2,402 | 9,945 |
| Apples, Cripps Pink | 56 | 1,039 | 5,861 |
| Apples, Fuji | 274 | 5,619 | 40,601 |
| Apples, Gala | 901 | 6,772 | 45,044 |
| Apples, Granny Smith | 259 | 2,466 | 15,302 |
| Apples, Honeycrisp | 665 | 5,249 | 36,131 |
| Apples, Red Delicious | 372 | 5,249 | 36,131 |
| Cherries, dark red | 528 | 10,620 | 42,486 |
| Cherries, red | 517 | 7,048 | 25,841 |
| Cherries, yellow | 542 | 6,808 | 25,447 |

ECF No. 6-32 at 4 of 7; ECF No. 6-13 at 7–8, 19 of 20.

Plaintiffs can hardly claim that the worker data impugns the employer data when the worker samples are such a tiny fraction of the employer samples. In the case of Braeburn apples, for example, the worker sample is over 100 times smaller than the

employer sample, and accounts for only one-tenth of one percent (0.1%) of the total

worker population. Even the largest worker sample, for Gala apples, is more than 7

times smaller than the employer sample, and accounts for only 2% of the total worker

population. These sample sizes are far too small to yield reliable data.

Fifth, and in a related vein, the worker samples are not representative of the

total populations. Indeed, ESD expressly cautioned that was not able to draw a

representative sample of workers due to limitations in its worker survey methodology.

*See* ECF No. 6-32 at 2 of 7 ("limiting the worker sample to [unemployment insurance]

claimants is *not necessarily representative of all seasonal workers*, meaning there is

an *inability to draw a representative sample* of the entire population") (emphasis

added). The fact that ESD itself does not believe the worker data was drawn from a

representative sample is another compelling reason to disregard it.

Sixth, the employer survey and the worker survey are not compatible on wage-

related questions. The employer survey asks employers to report "each unique wage

rate" paid during the "busiest week" of the employer's season. ECF No. 6-5 at 8 of

18. The worker survey, by contrast, asks a much less specific question: "*In general*,

what were you paid to pick this variety?" Drake Decl., Ex. A (emphasis added). Even

more problematically, the worker survey instrument asks workers to report a single

wage across multiple employers. As illustrated below, this forces workers to report

*either* a piece rate *or* an hourly wage for each crop activity, even if they were actually

paid both wages by different employers:

RESPONSE TO PLAINTIFFS' REVISED MOTION FOR PRELIMINARY INJUNCTION - 29

| 1. Apple Variety | 2. Wage | 3. Wage Unit (If by bin answer column 4) | | | 4. Hourly Guarantee (for piece rate only) | 5. Number of Employers you worked for picking this variety | 6. Bonus (Y/N) |
|---|---|---|---|---|---|---|---|
| ☐ Red Delicious | $_____ per | ☐Bin | ☐Hour | ☐ I don't know | $_____ per hour | _____ number of employers | ☐Yes ☐No |
| ☐ Gala | $_____ per | ☐Bin | ☐Hour | ☐ I don't know | $_____ per hour | _____ number of employers | ☐Yes ☐No |
| ☐ Fuji | $_____ per | ☐Bin | ☐Hour | ☐ I don't know | $_____ per hour | _____ number of employers | ☐Yes ☐No |

Id.  If workers prefer piece rate wages by the wide margins that Plaintiffs claim, it stands to reason that they will typically list a piece rate wage on the survey, thereby signaling that *all* employers paid by the piece rate, even if that was not the case.

In the final analysis, the worker survey data is not reliable.  Plaintiffs have drastically overstated its significance, and have little chance of prevailing on the merits of their claim that it warrants an adjustment of the challenged PWRs.

**D. A balancing of the equities weighs against granting preliminary relief.**

Plaintiffs' analysis of the equitable factors is largely an appeal to fairness. While DOL is sympathetic to Plaintiffs' concerns, it cannot allow them to influence the prevailing wage finding process.  The purpose of the prevailing wage finding process is to ascertain the *prevailing* wage paid on the open labor market.  That is exactly what has been done.  The data shows that Washington employers have gone away from piece rate wages for certain harvesting activities in large numbers, and that hourly wages are, at least for now, the prevailing method of payment for those activities.  As such, Plaintiffs have not met their heavy burden to show a clear causal link between the harms they may experience and DOL's alleged conduct.

//

//

RESPONSE TO PLAINTIFFS' REVISED MOTION FOR PRELIMINARY INJUNCTION - 30

**E. No forward-looking injunctive relief is warranted.**

Plaintiffs' final request is for an order compelling DOL to "remove the 'hourly guarantee' from the 2020 survey instrument and re-survey the affected questions." ECF No. 19 at 26. The Court should deny this request for two reasons. First, *DOL* cannot be compelled to take those actions because DOL does not administer the survey. That responsibility belongs to ESD. Second, the 2020 survey has already concluded. DOL is advised that the cost to resurvey employers would be enormous. There is no reason to put ESD to that expense, particularly when minimum wage guarantees can be "ignored" on the back end through modified data analysis if necessary.

## VI.    CONCLUSION

For the foregoing reasons, DOL respectfully requests that Plaintiffs' Revised Motion for Preliminary Injunction be denied.

DATED this 25th day of January, 2021.

William D. Hyslop
United States Attorney

*s/ John T. Drake*
John T. Drake
Jessica A. Pilgrim
Assistant United States Attorneys
*Attorneys for U.S. DOL Defendants*

1

**CERTIFICATE OF SERVICE**

2

I hereby certify that on January 25, 2021, I caused to be delivered via the

3

method listed below the document to which this Certificate of Service is attached

4

5

(plus any exhibits and/or attachments) to the following:

6

| NAME & ADDRESS | Method of Delivery |
|---|---|
| Lori Jordan Isley<br>Blanca Rodriguez<br>Andrea Schmitt<br>Hannah Woerner<br>COLUMBIA LEGAL SERVICES<br>6 South Second Street, Suite 600<br>Yakima, WA 98901 | ☒CM/ECF System<br>☐Electronic Mail<br>☐U.S. Mail<br>☐Other: _____ |
| Kathleen Phair Barnard<br>BARNARD IGLITZIN & LAVITT, LLP<br>18 West Mercer Street, Suite 400<br>Seattle, WA 98119 | ☒CM/ECF System<br>☐Electronic Mail<br>☐U.S. Mail<br>☐Other: _____ |

7

8

9

10

11

12

13

14

15

*s/John T. Drake*_____
John T. Drake

16

17

18

19

20

21

22

23

24

25

26

27

28