FILED IN THE
U.S. DISTRICT COURT
EASTERN DISTRICT OF WASHINGTON

Mar 01, 2021

SEAN F. McAVOY, CLERK

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WASHINGTON

| | |
|---|---|
| RAMON TORRES HERNANDEZ and FAMILIAS UNIDAS POR LA JUSTICIA, AFL-CIO, a labor organization,<br><br>                  Plaintiffs,<br><br>    v.<br><br>AL STEWART, in his official capacity as Acting United States Secretary of Labor, and UNITED STATES DEPARTMENT OF LABOR,<br><br>                  Defendants. | No.    1:20-cv-03241-SMJ<br><br>**ORDER GRANTING IN PART PLAINTIFFS' REVISED MOTION FOR PRELIMINARY INJUNCTION** |

Flawed input produces flawed output. Defendants unquestioningly use methodologically unsound employer survey data to set prevailing wage rates for agricultural workers in Washington State. With no proper safeguards in place, they have abdicated their duty to protect the wages of domestic workers. Defendants cannot cloak the injustices created by the survey with the U.S. government seal of approval, turn away, and say "nothing to see here."  This court will not allow that.

Plaintiffs, an agricultural worker and a labor organization, sued Defendants, alleging that they arbitrarily and capriciously certified prevailing wage rates based

on the 2019 Agricultural Peak Employment Wage and Practice Survey ("the survey" or "the prevailing wage survey") that do not accurately reflect the wages of agricultural workers in Washington. They request preliminary injunction relief to protect the wages of the affected agricultural workers, who live at or below the poverty line. Specifically, they ask the Court to (1) order Defendants to require all H-2A employers in harvest tasks for which no piece rate was found to pay the certified piece rate based on the 2018 prevailing wage survey, plus five percent; and (2) order Defendants to require Employment Security Department (ESD) to eliminate the "guaranteed wage" concept from the 2020 survey and resurvey the responses gathered to date. ECF No. 19 at 36. The Court held a preliminary injunction hearing on February 18, 2021, and reserved ruling. For the reasons discussed below, the Court now grants injunctive relief, although in a form slightly different than requested by Plaintiffs.[1]

## BACKGROUND

In Washington State, agriculture constitutes twelve percent of the economy. Wash. Farm Bureau (last accessed Feb. 23, 2021), https://wsfb.com/ag-in-washington. The state leads the nation in production of apples, blueberries, sweet cherries, pears, hops, concord grapes, spearmint oil, and wrinkled seed peas. Wash.

---

[1] The Court also grants Defendants' unopposed Motion to Take Judicial Notice, ECF No. 55, and related motion to expedite, ECF No. 56.

ORDER GRANTING IN PART PLAINTIFFS' REVISED MOTION FOR PRELIMINARY INJUNCTION – 2

State Emp. Sec. Dep't, *2017 Agricultural Workforce Report: Labor Market and Economic Analysis* (2017 Agriculture Workforce Report) 5 (Sept. 2019), https://esdorchardstorage.blob.core.windows.net/esdwa/Default/ESDWAGOV/labor-market-info/Libraries/Industry-reports/Annual-Ag-Report/2017%20 Agricultural%20Workforce%20Report.pdf. Yet many farmworkers still live in poverty and struggle to meet basic needs. *See, e.g.*, ECF Nos. 4, 5, 6-26 & 6-28.

Despite their crucial role, farmworkers have historically and consistently faced marginalization and poor working conditions. Workers under the Bracero program, the predecessor to the H-2A program, for example, endured conditions that have "been likened by some to indentured slavery where employer exploitation was rampant and inhumane." H.R. Rep. 99-682, at 83 (1986). While Congress has discontinued that program, in part due to the efforts of farmworker-activists like Maria Moreno and Cesar Chavez, farmworkers remain vulnerable. *See, e.g.*, ECF No. 33 at 2; Sam Bloch, *You Already Know Cesar Chavez. What About Maria Moreno*, The Counter (Sept. 23, 2019, 2:36 PM), https://thecounter.org/cesar-chavez-maria-moreno-ufw-awoc-farm-labor/. Migrant workers face substandard housing conditions. Wash. State Dep't of Cmty., Trade & Econ. Dev., *Farmworker Housing in Washington State: Safe, Decent, and Affordable* 1, 6 (Mar. 2005), https://www.commerce.wa.gov/wp-content/uploads/2018/06/HTF-Reports-Farm-Worker-Housing-Report.pdf (noting the "persistent lack of safe, affordable

housing" for farmworkers who "do not earn enough to afford market-rate housing"). Farmworkers also face food insecurity, lack of healthcare, and other vulnerabilities, and are often undereducated. *See, e.g.*, ECF Nos. 4, 5, 6-23, 6-26, 6-27, 6-28 & 6-29.

The COVID-19 pandemic has underscored the longstanding importance of the Washington State agricultural industry and the toils of agricultural workers. The United Nations warned that lockdowns and worker scarcity could lead to a global food shortage, and Washington designated farm work as "essential." *See* Proclamation of the Governor No. 20-25, Appendix (Wash. Mar. 23, 2020), https://www.governor.wa.gov/sites/default/files/WA%20Essential%20Critical%20Infrastructure%20Workers%20%28Final%29.pdf. Despite the increased risk of contracting the disease,[2] farmworkers have continued to work to provide food to families in Washington and beyond.

---

[2]  Many outbreaks have occurred at farms in Washington State. *See, e.g.*, Nat'l Ctr. for Farmworker Health, *COVID-19 in Rural America: Impact on Farms & Agricultural Workers* 5–6 (Feb. 1, 2021), http://www.ncfh.org/uploads/3/8/6/8/38685499/msaws_and_covid-19_fact_sheet_2.1.21.pdf. The health risks to Hispanic farmworkers, who constitute 99.8% of the farmworkers in Washington State, are especially pronounced. *See* Ctrs. for Disease Control & Prevention, *Coronavirus Disease Among Workers in Food Processing, Food Manufacturing, and Agriculture Workplaces* (Jan. 2021), https://wwwnc.cdc.gov/eid/article/27/1/20-3821_article; COVID-19 Hospitalization and Death by Race/Ethnicity, CDC (last accessed Feb. 24, 2021), https://www.cdc.gov/coronavirus/2019-ncov/covid-data/investigations-discovery/hospitalization-death-by-race-ethnicity.html. (Hispanic males are 3.2

ORDER GRANTING IN PART PLAINTIFFS' REVISED MOTION FOR PRELIMINARY INJUNCTION – 4

Plaintiffs allege that in Washington State, the prevailing practice in the tree fruit industry has been to pay "piece-rate" wages to farmworkers, that is, a wage based on the output of the worker. ECF No. 19 at 8. Under this system, skilled farmworkers can earn upwards of $30 per hour. *See* ECF No. 4 at 3; ECF No. 5 at 4. Due to the cyclical nature of the harvest, workers and their families rely on higher wages earned during the peak months to offset the months when seasonal work disappears. *See* ECF No. 4 at 5. Plaintiffs argue that the most recent prevailing wage survey, the 2019 survey, taken by ESD and certified by Defendants, improperly drove down the prevailing wages for several crops.

## A.    H-2A Program

The H-2A visa program allows employers to hire foreign agricultural workers to perform temporary or seasonal labor in the United States. *See* 8 U.S.C. § 1188. Because the hiring of foreign workers could weaken the market for domestic labor, Defendants must ensure that "wages and working conditions of workers in the United States similarly employed" will not be "adversely affect[ed]." 8 U.S.C. § 1188(a)(1)(B). H-2A employers must pay their employees the highest of (1) the Adverse Effect Wage Rate ("AEWR"), (2) the prevailing hourly wage or piece rate for the geographical region and type of work, (3) a collectively bargained wage, or

---

times more likely than non-Hispanic males to require hospitalization from coronavirus.); ECF No. 5 at 6.

(4) the Federal or State minimum wage. 20 C.F.R. §§ 655.120(a), 655.122(a). The AEWR, which was $15.03 at the time of the 2019 survey, is the rate that the Defendants have determined is necessary to ensure the employment of H-2A workers will not adversely affect domestic workers. *See* ECF No. 6-5 at 3. The prevailing wage rate "provides an additional safeguard against wage depression in local areas and agricultural activities." 85 Fed. Reg. 70445, 70450 (Nov. 5, 2020).

**B.    Calculations of prevailing wages**

Defendants set prevailing wage rate based on survey data gathered from both H-2A and non-H-2A employers. ECF No. 6-2. The survey data is collected by state workforce agencies (in Washington, ESD), which follow the guidelines set forth in ETA Handbook 385 and subsequent guidance, including guidance letters called "TEGLs." *See* ECF No. 6-31. ESD has discretion, based on its experience and knowledge of local job markets, to design and conduct the surveys in a manner that will yield accurate data within the parameters established by Defendants. *See* ECF No. 6-2. ESD has started reporting piece rate wages with and without hourly guarantees as different units of payment. *See* ECF Nos. 6-13, 24-1, 24-2 & 24-3. It has also conducted a worker survey, "for research purposes only" since 2016. *See* ECF Nos. 6-8, 6-33.

ESD submits the results of the survey to Defendants' Office of Foreign Labor Certification (OFLC). *See* ECF No. 6-10. ESD generally submits a Form ETA-232

ORDER GRANTING IN PART PLAINTIFFS' REVISED MOTION FOR PRELIMINARY INJUNCTION – 6

and Microsoft Excel spreadsheets which provide more detail for each crop activity that meets the requirements for a prevailing wage. *See* ECF No. 6-2; *see also* ECF Nos. 6-13, 24-1, 24-2 & 24-3. Defendants' National Prevailing Wage Center (within OFLC) then processes and validates the data. First, Defendants verify sample sizes. For those activities with a sufficient sample size, Defendants then apply the "40 percent rule" and the "51 percent rule" to determine the prevailing wage rate. These rules are set forth in Handbook 385 as follows:

   a. 40 percent rule. A single rate or schedule which–accounts for the wages paid to 40 percent or more of the domestic seasonal workers in a single crop activity is the prevailing rate. If there are two such rates or schedules, the one accounting for the greater number of domestic seasonal workers becomes the prevailing rate. If two rates or schedules are being paid to the same number of workers and each rate accounts for at least 40 percent of the workers, then both rates or schedules are prevailing.

   b. 51 percent rule. If no single rate or schedule accounts for 40 percent or more of the workers and the rates are all in the same unit of payment (e.g., per hour, per lb.), array the rates in descending order and then count the cumulative number of workers, starting with the lowest in the array, until 51 percent of the workers covered in the survey are included. The rate reached at this point is the prevailing wage rate. (Rates such as per bushel and per 1 1/4 bushel box represent different units of payments).

   c. More than one unit of payment. If no single rate is being paid to at least 40 percent of the workers in a single crop activity and there is more than one unit of payment, such as 1 bushel and 1 1/8 bushels, determine the unit which is applicable to the largest number of workers. Using this unit of payment, determine the prevailing rate in accordance with (a) or (b) above.

ORDER GRANTING IN PART PLAINTIFFS' REVISED MOTION FOR PRELIMINARY INJUNCTION – 7

ECF No. 6-2 at 6–7. Based on the 2019 survey, of the thirty-five activities for which a prevailing wage was certified, six were certified at a piece rate wage with an hourly guarantee, and the rest were certified as hourly wages. ECF No. 23-1. Eleven were set at $12.00, the state minimum wage at the time of the survey. *Id.* This is a change from historical prevailing wages in Washington State, which were commonly piece rate wages. *See* ECF No. 6-8.

## LEGAL STANDARD

### A.    Preliminary Injunctions Generally

A preliminary injunction is "an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Winter*, 555 U.S. at 20; *see also All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1131–32 (9th Cir. 2011).

"A plaintiff seeking a preliminary injunction must establish [1] that he is likely to succeed on the merits, [2] that he is likely to suffer irreparable harm in the absence of preliminary relief, [3] that the balance of equities tips in his favor, and [4] that an injunction is in the public interest." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). "[P]laintiffs must establish that irreparable harm is *likely*, not just possible, in order to obtain a preliminary injunction." *All. for the Wild Rockies*, 632 F.3d at 1131 (emphasis in original).

Even so, the Ninth Circuit employs a "sliding scale approach." *Id*. Under that

approach, "the elements of the preliminary injunction test are balanced, so that a stronger showing of one element may offset a weaker showing of another." *Id*. Thus, "a preliminary injunction could issue where the likelihood of success is such that 'serious questions going to the merits were raised and the balance of hardships tips sharply in [plaintiff's] favor.'" *Id*. (alterations in original) (quoting *Clear Channel Outdoor, Inc. v. City of Los Angeles*, 340 F.3d 810, 813 (9th Cir. 2003)). "The 'serious questions' approach survives *Winter* when applied as part of the four-element *Winter* test." *Id*. at 1131–32. Still, "[w]hen the government is a party, the[] last two factors merge." *Drakes Bay Oyster Co. v. Jewell*, 747 F.3d 1073, 1092 (9th Cir. 2014) (citing *Nken v. Holder*, 556 U.S. 418, 435 (2009)).

## B.    Mandatory and Prohibitory Injunctions

There are two kinds of preliminary injunction: mandatory and prohibitory. *Arizona Dream Act Coal. v. Brewer*, 757 F.3d 1053, 1060 (9th Cir. 2014). Courts generally disfavor mandatory injunctions, which "order[] a responsible party to take action," and require a heightened showing of need by the plaintiff. *Id.* (quoting *Marlyn Nutraceuticals, Inc. v. Mucos Pharma GmbH & Co.*, 571 F.3d 873, 878–79 (9th Cir. 2009)). Plaintiffs must meet a "doubly demanding" standard and show "that the law and facts *clearly favor* [their] position, not simply that [they are] likely to succeed." *Garcia v. Google, Inc.*, 786 F.3d 733, 740 (9th Cir. 2015) (emphasis in original).

ORDER GRANTING IN PART PLAINTIFFS' REVISED MOTION FOR PRELIMINARY INJUNCTION – 9

By contrast, a prohibitory injunction "prohibits a party from taking action and preserves the status quo pending a determination of the action on the merits." *Arizona Dream Act Coal.*, 757 F.3d at 1060 (quoting *McCormack v. Hiedeman*, 694 F.3d 1004, 1019 (9th Cir. 2012)). "'[S]tatus quo' refers to the legally relevant relationship *between the parties* before the controversy arose." *Id.* at 1061 (emphasis in original).

## C.    The Administrative Procedure Act

The Administrative Procedure Act (APA) directs district courts to "hold unlawful and set aside" an agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" or that is taken "without observance of procedure required by law." 5 U.S.C. § 706(2)(A) & (D). Courts must reject "[c]onstructions that are contrary to clear Congressional intent or frustrate the policy that Congress sought to implement." *Earth Island Inst. v. Hogarth*, 494 F.3d 757, 765 (9th Cir. 2007). And agency action that is not the product of reasoned decision making is arbitrary and capricious. *See Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). An agency must "cogently explain why it has exercised its discretion in a given manner." *Id.* at 48.

Under this standard, courts "do not substitute [their] judgment for that of the agency." *Earth Island Inst. v. U.S. Forest Serv.*, 697 F.3d 1010, 1013 (9th Cir. 2012) (internal quotations omitted). Deference owed to an agency's decision "is highest

when reviewing an agency's technical analyses and judgments involving the evaluation of complex scientific data within the agency's technical expertise." *League of Wilderness Defenders Blue Mountains Biodiversity Project v. Allen*, 615 F.3d 1122, 1130 (9th Cir. 2010).

The APA directs courts to "review the whole record or those parts of it cited by a party." 5 U.S.C. § 706. A court's review is thus generally limited to the administrative record before the agency decision-maker. *See Fla. Power & Light Co. v. Lorion*, 470 U.S. 729, 743 (1985) ("the focal point for judicial review should be the administrative record already in existence, not some new record made initially in the reviewing court.") (internal alterations omitted). But a court may consider "extra-record" evidence when doing so is "necessary to explain agency decisions." *Zirkle Fruit Co. v. U.S. Dep't of Labor* (*Zirkle I*), 1:19-cv-03180-SMJ, 2020 WL 1917343, at *2-3 (E.D. Wash. Jan. 27, 2020) (quoting *Sw. Ctr. for Biological Diversity v. U.S. Forestry Serv.*, 100 F.3d 1443, 1450 (9th Cir. 1996)).

## DISCUSSION

### A.    Plaintiffs have Article III standing

Defendants argue that Plaintiffs do not have Article III standing because they have not shown a concrete and particularized injury. ECF No. 23 at 10.  Standing is an "irreducible constitutional minimum" for litigating claims in federal court. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992). To establish standing, a plaintiff must

ORDER GRANTING IN PART PLAINTIFFS' REVISED MOTION FOR PRELIMINARY INJUNCTION – 11

show (1) an injury in fact that is concrete and particularized; (2) a causal link between the alleged injury and the defendant's alleged conduct; and (3) a likelihood that the injury can be remedied by a favorable decision. *Id.* at 560–61. When the plaintiff is an organization bringing claims on behalf of its members, it must show that "(a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purposes; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Am. Diabetes Ass'n v. United States Dep't of the Army*, 938 F.3d 1147, 1155 (9th Cir. 2019).

Plaintiff Torres Hernandez is a domestic worker, not an H-2A worker, and Plaintiff Familias Unidas por la Justicia, AFL-CIO (FUJ), is an organization—a labor union—whose members are also domestic workers. ECF Nos. 4, 5. But Torres Hernandez states that because H-2A employers will offer lower wages due to the hourly prevailing wage rates, he will be forced to seek employment with non H-2A employers before H-2A employers. ECF No. 4 at 5–6. The prevailing wage reports apply to domestic workers who are employed by an H-2A employer performing the same work as H-2A workers. 20 C.F.R. § 655.122(a).

An injury, for standing purposes, need not be large nor precisely quantifiable. *United States v. Students Challenging Regul. Agency Procedures (SCRAP)*, 412 U.S. 669, 689 n.14 (1973). Loss of opportunity constitutes injury for standing

purposes. *O'Bannon v. NCAA*, 802 F.3d 1049, 1069 (9th Cir. 2015). Individuals such as Plaintiff Torres Hernandez and FUJ's members, who would ordinarily seek work with H-2A employers, face such lost opportunity. In fact, lowered wages to domestic workers is *exactly* what the H-2A statutory scheme is designed to protect against. *See Alfred L. Snapp & Son, Inc. v. Puerto Rico, ex rel. Barez*, 458 U.S. 592, 596 (1982). Plaintiffs thus have standing.

## B.    Plaintiffs seek a mandatory injunction

Plaintiff argues that the relief they seek will preserve the status quo, because Defendants have consistently, over more than ten years, found piece rate wages prevailing. *Id.*

True, standards for preliminary injunctive relief are not "hard and fast rules, to be rigidly applied to every case regardless of its peculiar facts, because the infinite variety of situations in which a court of equity may be called upon for interlocutory injunctive relief requires that the court have considerable discretion in fashioning such relief." *Hernandez v. Sessions*, 872 F.3d 979, 999 (9th Cir. 2017) (internal citations and alternations omitted). "Mandatory injunctions are most likely to be appropriate when the status quo is exactly what will inflict the irreparable injury upon complaint." *Id.* Although both prongs of the injunctive relief requested "orders a responsible party to take action," reverting to the prevailing wages from the 2018 survey serves to maintain the status quo and requires little hardship to

ORDER GRANTING IN PART PLAINTIFFS' REVISED MOTION FOR
PRELIMINARY INJUNCTION – 13

1   Defendants. *See Arizona Dream Act Coal.*, 757 F.3d at 1060. It is like a prohibitory

2   injunction. But requiring Defendants to amend the 2020 survey and to resurvey any

3   results already collected will require much time and expense. The Court thus applies

4   the heightened standard, although Plaintiffs would ultimately prevail under either.

**C.    Plaintiffs are unlikely to succeed on the merits of their argument that Defendants had to engage in notice and comment rulemaking**

7        Defendants' ETA Handbook No. 385 provides the required standards for

8   conducting prevailing wage surveys. 84 Fed. Reg. 36168, 36184 (July 26, 2019).

9   Defendants have not engaged in notice-and-comment rulemaking regarding the

10   inclusion of the hourly wage guarantee concept in the prevailing wages survey.

11       Plaintiffs argue that this change in the prevailing wage calculation

12   methodology is a legislative rule (not an interpretive rule, which would be exempt

13   from notice-and-comment requirements) because it changes the law regarding

14   prevailing wages and results in the elimination of higher prevailing piece-rate

15   wages. ECF No. 19 at 19. Legislative rules "create rights, impose obligations, or

16   effect a change in existing law pursuant to authority delegated by Congress," while

17   interpretative rules "merely explain, but do not add to, the substantive law that

18   already exists." *Wilson v. Lynch*, 835 F.3d 1083, 1099 (9th Cir. 2016) (internal

19   quotation omitted); *see also Mendoza v. Perez*, 754 F.3d 1002, 1021 (D.C. Cir.

20   2014) (explaining that "[t]o be interpretative, a rule must derive a proposition from

ORDER GRANTING IN PART PLAINTIFFS' REVISED MOTION FOR
PRELIMINARY INJUNCTION – 14

an existing document whose meaning compels or logically justifies the proposition" and holding that the TEGLs at issue did not derive from any statute or regulation) (internal quotation omitted).

This case differs little from *Zirkle Fruit Co. v. U.S. Dep't of Labor* ("*Zirkle II*"), 442 F.Supp. 3d 1366 (E.D. Wash. 2020), with respect to notice and comment requirements. In *Zirkle II*, this Court determined that Defendants did not have to engage in notice and comment to alter the provisions of Handbook 385. 442 F.Supp.3d at 1376. "Handbook 385 is a statement of agency practice or procedure, and not a legislative rule. For one thing, Handbook 385 was not promulgated through the notice and comment rulemaking process" nor does it "prescribe 'individual rights and obligations,' the hallmark of a legislative rule." *Zirkle II*, 442 F.Supp.3d at 1376. In that case, the United States Department of Labor changed the Handbook's requirement for in-person employer interviews, which was announced through changes in ETA-232 forms and through multiple TEGLs. *See Zirkle II*, 442 F.Supp.3d at 1377. Plaintiffs argue that "the interjection of the hourly wage guarantee at issue here, which is not described in the Handbook or elsewhere in Defendants' policies, substantially changes the wage finding methodology and has an adverse effect on prevail wages in direct conflict with the statutory protection for domestic farmworkers." ECF No. 19 at 19.

1    Defendants argue that the inclusion of hourly guarantees was not a "change"

2    in their practice at all. ECF No. 23 at 13. Handbook 385 states that "Rates with [an]

3    earnings guarantee represent a different method of payment from piece rates

4    without earnings guarantees, and should be listed separately." ECF No. 6-2 at 23.

5    As in *Zirkle II*, Defendants did not create a new procedure that fundamentally

6    changed the wage finding process.

7    True, the Handbook may not detail the "special procedures" for hourly

8    guarantees like it does for base rate-bonus combinations. ECF No. 6-2 at 6–8. And

9    the mention of wage guarantees is in the "Domestic Agricultural Inseason Wage

10    Report" Section, ETA 232, rather than the "Collection of Wage Information"

11    Subsection of the "Wage Finding Process" Section. *Compare* ECF No. 6-2 at 22–

12    23 *with id.* at 6–8. But state agencies, including ESD, always had the option to

13    differentiate piece rate wages with hourly guarantees from those without.

14    Defendants did not change Handbook 385. Defendants did not adopt any new

15    methodology "without observance of procedure required by law." 5 U.S.C. §

16    706(2)(D).

17    **D.    Defendants did not act arbitrarily and capriciously by refusing to exercise its discretion to certify prevailing wages where the sample size was below the required threshold**

18

19    Plaintiffs argue that Defendants should exercise their discretion in allowing

20    certification of a prevailing wage even when the survey data does not reach the

ORDER GRANTING IN PART PLAINTIFFS' REVISED MOTION FOR
PRELIMINARY INJUNCTION – 16

sample size threshold of fifteen percent of the population doing a given activity.[3]

ECF No. 19 at 24–26.

> Handbook 385 dictates that when more than 3000 domestic workers are engaged in a given crop activity, as a "general guide," a prevailing wage survey should include data representing at least 15% of that population. The Court reads this provision to mean that the 15% threshold prescribed by Handbook 385 is not an absolute floor, anything less than which results in an invalid PWR, but rather an approximate guideline.

*Evans Fruit Co., Inc. v. USDOL*, 1:19-cv-03202-SMJ, 2019 WL 7820432, at *6 (E.D. Wash. Oct. 11, 2019) (citations omitted). In 2017, ESD advocated for Defendants to allow wage finding determinations for sample sizes of 10.74 to 13.39 percent. ECF No. 6-11 at 3–4. ESD argues that failure to do so could "lead to a large decrease in the required wage for workers in the Washington apple harvest . . . in direct conflict with the fundamental goal . . . to ensure domestic workers are not adversely effected by the use of foreign labor." *Id.* at 2.

But Defendants' failure to exercise this discretion is not arbitrary and capricious. As they point out, avoiding such subjective discretion boosts methodological consistency and accuracy. ECF No. 23 at 16. It also facilitates efficient administration of the survey. Without additional guidance to determine

---

[3] Plaintiffs also argue that Defendants failed to "round up" sample sizes of 14.64 and 14.52 as is Defendants' policy. ECF No. 19 at 24; *see also* ECF No. 20-4 at 7. Although this failure was arbitrary and capricious, it appears that Defendants have since certified a prevailing wage for these activities, so this argument is moot. ECF No. 23-1 at 2; ECF No. 23 at 16.

ORDER GRANTING IN PART PLAINTIFFS' REVISED MOTION FOR PRELIMINARY INJUNCTION – 17

when Defendants should exercise such discretion, the integrity of the process would be undermined. *Id.* It could also invite frequent litigation on the sample size issue. *Id.*

**E.    The law clearly favors Plaintiffs' arguments that Defendants acted arbitrarily and capriciously because the survey does not have safeguards to ensure reliability**

Plaintiffs argue that Defendants' prevailing wage survey methodology is arbitrary and capricious because Defendants failed to: (1) explain the reason for the change or announce the change; (2) define the "hourly wage guarantee," making rational application of the methodology impossible; and (3) consider the resulting elimination of higher piece-rate wages. As Defendants rightly point out, the prevailing wage survey is meant to be "wage finding," not "wage setting." Tr. (Feb. 18, 2021). But without proper safeguards, the results of the survey *are* setting wages—and doing so arbitrarily and capriciously. Defendants are making the exact mistake of which they accuse Plaintiffs.

A decision should only be reversed as arbitrary and capricious when the agency "relied on factors Congress did not intend it to consider, entirely failed to consider an important aspect of the problem, or offered an explanation that runs counter to the evidence before the agency or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Lands Council*

*v. McNair*, 537 F.3d 981, 987 (9th Cir. 2008) (en banc) (internal quotations omitted).

In 2018, ESD noted in a letter to Defendants that "piece rates are more in line with apple harvesting culture than paying the AEWR." ECF No. 6-11 at 3. Plaintiffs have provided extra-record evidence that employers have historically overwhelmingly paid piece rate wages. *See, e.g.*, ECF No. 7 at 8–9; ECF No. 34 at 2; *but see* ECF No. 25 at 2 (describing trend away from piece rate wages).

**1.    The survey asks employers to differentiate piece rate wages with and without an hourly guarantee, but does not define that concept, which results in confusion and invalid responses**

An agency must "cogently explain why it has exercised its discretion in a given manner." *Motor Vehicle Mfrs.,* 463 U.S. at 43. Handbook 385 has always contemplated the differentiating piece rate wages with and without wage guarantees. ESD, the state agency, changed its survey methodology after many years of administering the survey without differentiating hourly guarantees within the parameters provided by Defendants.[4] "[A] federal agency's reliance on a state agency's analysis without duplicating the state's evaluative process is not arbitrary

---

[4] Although ESD always had the option to calculate the prevailing wages using such differentiation, it did not do so until 2016, and only after consulting Defendants. *See* ECF Nos. 6-2; 46-2. Thus, Plaintiffs proposal of returning to the prevailing wage rates certified based on the 2018 survey is, admittedly, an imperfect solution. But this solution most closely maintains the status quo while protecting worker wages. The Court must "start somewhere," and Plaintiffs' proposal is feasible and legally permissible. *See* Tr. (Feb. 18, 2021).

ORDER GRANTING IN PART PLAINTIFFS' REVISED MOTION FOR PRELIMINARY INJUNCTION – 19

or capricious, particularly where the pertinent statute or regulation specifically envisions cooperation between the state and federal governments." *Zirkle II*, 442 F.Supp.3d at 1379. But "an agency's wholly unexplained acceptance of another entity's conclusions, with no apparent effort to ensure the reliability of those conclusions or the evaluative process that produced them, . . . is arbitrary and capricious." *Id.*; *see also* 20 C.F.R. § 653.501(c)(2)(i). ESD sought *guidance* from Defendants, and was instructed to include, and then continue to include, the hourly wage guarantee, even when ESD pointed out the flaws in the data. *See* ECF Nos. 46-2; 46-3; *see also supra*.

Employers, asked to report their wages without proper guidance, report hourly wage guarantees reflecting a lack of understanding of the concept. *See* ECF No. 6-5 at 17–18 (Definitions and Instructions insert does not define "hourly guarantee"). Unless the employer's wage guarantee is higher than the wage already guaranteed by law, it is meaningless. Defendants concede this. ECF No. 23 at 18–19. Many employers report hourly guarantees at or below the state minimum wage. *See, e.g.*, ECF Nos. 24-1, 24-2 & 24-3. Still more employers report an hourly wage guarantee at or below the controlling AEWR. *See id*. In fact, the examples provided on the survey itself were below the AEWR. *See, e.g.*, ECF No. 6-5 at 12. True, non-H-2A employers need not pay their workers at or above the AEWR. But because the survey analysis did not factor in whether a particular reported hourly

1    guarantee came from an H-2A or a non-H-2A employer, the survey becomes further

2    unreliable. None of the hourly guarantees for Skeena Cherries or berries were higher

3    than the AEWR, and only four were higher than the AEWR for yellow cherries. *See*

4    ECF Nos. 24-1, 24-2, 24-3; *see also* ECF No. 21 at 3–4.

5            Defendants argue that any error is harmless, because recalculating the

6    prevailing wages with all the piece rate wages with wage guarantees at or below

7    minimum wage does not change the results. For each challenged prevailing wage

8    rate, hourly wages would still account for the highest number of workers, and thus

9    would still be the unit of payment within which the 40 and 51 percent rules would

10   apply. *See* ECF No. 6-2 at 6–7. But Defendants' recalculations only discount those

11   hourly guarantees below the state minimum wage. As discussed above, that is not

12   sufficient. If an employer is required by law to pay a certain wage, a reported wage

13   at or below that threshold should not be considered in the data. Thus, an H-2A

14   employer reporting an hourly guarantee at or below the AEWR is erroneous.

15           More importantly, even if recalculating the prevailing wages discounting

16   those responses that were *clearly* erroneous does not change the finding, the survey

17   is still arbitrary and capricious. *None* of the responses can be deemed reliable. More

18   than half of the reported guarantees were at or below minimum wage for Skeena

19   cherries and berries (and about 45% for yellow cherries). *See* ECF Nos. 24-1, 24-2

20   & 24-3. If more than half of the employers reported unlawful wages (intentionally

ORDER GRANTING IN PART PLAINTIFFS' REVISED MOTION FOR
PRELIMINARY INJUNCTION – 21

or unintentionally),[5] how could Defendant think that the others were not also confused? Defendants, incredibly, seem to discount this idea, arguing summarily that "if you are a fruit farmer, you understand what an hourly guarantee means." *See* Tr. (Feb. 18, 2021). But with no provided definition, no uniform interpretation exists. This is underscored by the fact that confusion remains after years of the concept being used on the survey. Yet Defendants have not acted accordingly. It is precisely because of the failures of the survey that Defendants should not have trusted, nor certified, the results. The inconsistencies in the results "should have

---

[5] Underlying Plaintiffs' claims is the allegation that employers have falsely reported paying piece rate wages with hourly wage guarantees to drive down the calculated prevailing wage. In 2015, ESD noted that "preliminary analysis of responses to the 2015 Agricultural Wage and Practices Survey reveals significant differences from previous years' survey results. The differing responses line up with guidance publicly provided by the Washington Farm Labor Association (WAFLA) and appear to impact the preliminary prevailing wage rate estimates." ECF No. 6-8 at 2. "When respondents who were likely influenced by WAFLA are removed from the sample, the prevailing wage rates for harvest all apples [sic] is a piece rate." *Id.* at 4.

The Court does make any finding on whether employers are intentionally manipulating the survey. Even though piece rate wages incentivize workers, Defendants point out that there are reasons for favoring hourly wages, like quality control. ECF No. 23 at 23; *see also* ECF No. 25 at 2. Piece rate wages are also more complicated to administer, especially given recent Washington State Supreme Court rulings clarifying minimum wage requirements during rest periods. ECF No. 23 at 23–24; *see also Lopez Demetrio v. Sakuma Bros. Farms*, 353 P.3d 258 (Wash. 2015) (en banc); *Carranza v. Dovex Fruit Co.*, 416 P.3d 1205 (Wash. 2018).

But as explained throughout this Order, the survey as currently administered is *susceptible* to manipulation, making certification of its results arbitrary and capricious.

ORDER GRANTING IN PART PLAINTIFFS' REVISED MOTION FOR PRELIMINARY INJUNCTION – 22

slowed down the agency to figure out what is going on here and to make corrections because their duty, the whole reason for doing the survey is to protect those prevailing wages which continue to prevail." *See* Tr. (Feb. 18, 2021); *see also United Farm Workers v. U.S. Dep't of Labor*, No. 1:20-cv-01690-DAD-JLT, 2020 WL 7646406, at *8 (E.D. Cal. Dec. 23, 2020).

### 2.    Worker survey data

That the employer data is suspect makes even more confounding the fact that Defendants refuse to use worker survey data. By doing so, Defendants "entirely failed to consider an important aspect of the problem," *see League of Wilderness Defs. Blue Mountains Biodiversity Project v. Allen*, 615 F.3d 1122, 1130 (9th Cir. 2010) (quoting *Lands Council v. McNair*, 537 F.3d 981, 987 (9th Cir. 2008) (en banc)). They ignore that prevailing wage surveys are supposed to "ward off serious damage to the domestic labor market that could result in an influx of foreign labor paid below-market wages." *Zirkle II*, 442 F. Supp. 3d at 1383. In the survey that ESD did conduct, workers "overwhelmingly indicated higher piece-rate wages are the prevailing practice in Washington's tree-fruit industry." ECF No. 6-32 at 3–4. More than eighty-six percent of workers reported getting paid a piece rate wage. *Id.* at 3. For some crops, that number was almost ninety-five percent. *Id.* at 4. This stark contrast with the employer survey further calls into question the certified prevailing wages.

Although Handbook 385 states that wages reported by employers "must be verified through worker interviews," Defendants have formally abolished that requirement. *See* ECF No. 6-2. In 2013, with proper notice and comment rulemaking, Defendants updated its ETA-232 and ETA-232A forms to eliminate the requirement that state agencies conduct worker interviews. *See* ECF No. 24-5. Because of the changes to the employer survey, including the increasingly remote nature (mail or telephone surveys rather than in person), Defendants claimed the worker interview process became "obsolete." *See id.*; *see also* 78 Fed. Reg. 46373, 46373 (July 31, 2013) (agency's intent to "streamline the information collection process by removing outdated questions"); Tr. (Feb. 18, 2021).

Yet despite its alleged infeasibility and obsolescence, ESD still conducts the survey—funded by Defendants. *See* ECF No. 6-13 at 4. The survey states that it is for "research purposes only" and ESD did not design the worker survey to be used in the prevailing wage finding process. *See* ECF No. 26-1 at 2. It did not even submit the results of the survey to Defendants. ECF No. 6-32 at 3. But it conducts the surveys this way due to direction from Defendants, who stated that "USDOL does not 'use' worker survey results. Worker surveys are a mechanism by which [ESD] can 'validate' or 'verify' the wage survey responses that come in from growers." *Id.* ESD has even complained that "[l]ittle guidance has been given on how to use worker survey responses to compare with employer responses." ECF No. 6-32 at 3.

ORDER GRANTING IN PART PLAINTIFFS' REVISED MOTION FOR
PRELIMINARY INJUNCTION – 24

And because of this half-hearted support from Defendants, the worker survey data is incomplete. Less than half of the harvesting activities are represented in the dataset. ECF No. 6-32 at 2. And even for those activities for which *some* data exists, the sample size is small, often less than one percent of the estimated workforce. ECF No. 6-32 at 4; ECF No. 6-31 at 4 ("An average of 10 percent of the workers included in the sample for each wage survey must be interviewed.").[6] Because ESD drew worker surveys from unemployment insurance claimants, ESD recognizes "there is an inability to draw a representative sample of the entire population." ECF No. 6-32 at 2. Finally, the questions asked of employers and workers are different, meaning they cannot be effectively compared. *Compare* ECF No. 6-5 at 8 *with* ECF No. 26-1 at 3.

Defendants acted arbitrarily and capriciously by not conducting a reliable worker survey to validate the results of the employer survey. It cannot be denied: employers have an incentive to lie on the surveys. A lower prevailing wage finding is in their financial interests. Even considering Defendants' reasons for *not* requiring the worker survey, the Court cannot understate the importance of the survey as a check on employers. A methodologically reliable worker survey would help alert ESD and Defendants to any inconsistencies.

---

[6] Plaintiffs argue that the ten percent threshold was met for certain activities, which does not appear to be correct. ECF No. 32 at 12. Even so, this does not change the analysis.

ORDER GRANTING IN PART PLAINTIFFS' REVISED MOTION FOR PRELIMINARY INJUNCTION – 25

Defendants have thus "failed to consider an important aspect of the problem," through worker surveys or otherwise. *See League of Wilderness Defs. Blue Mountains Biodiversity Project*, 615 F.3d at 1130.

### F.    Plaintiffs have shown irreparable injury

Plaintiffs allege that the new methodology, which led to lower prevailing wages will (and already has) irreparably injured Plaintiffs. Jobs that they argue have always offered wages well above the state minimum wage and the AEWR through piece rate wages will suddenly be paid by the hour. *See* ECF No. 6-13 at 4–5. For the cherry harvest, for example, they allege that wages will decrease twenty to forty-seven percent.[7] ECF No. 7 at 8–10; *see also* ECF No. 6-12 at 3 (The CEO of the Washington Farm Labor Association, a nonprofit whose members consist of agricultural employers, stated that elimination of piece rate wages for apples would save employers millions of dollars).

Many employers have already submitted H-2A contracts ("Clearance Orders") for jobs beginning in early 2021, which are being accepted and published by Defendants. *See, e.g.*, ECF Nos. 6-17, 6-19 & 6-20. Clearance orders will dictate the terms for tens of thousands farmworker jobs this year. ECF No. 6-22 at 2.

---

[7] The Court takes judicial notice under Federal Rule of Evidence 201(b)(2) that the 2021 AEWR in Washington State is $16.34. 86 Fed. Reg. 10996, 10997 (Feb. 23, 2021). At that rate, the decrease could be as high as forty-five percent, rather than forty-seven percent. *See* ECF No. 7 at 9.

ORDER GRANTING IN PART PLAINTIFFS' REVISED MOTION FOR PRELIMINARY INJUNCTION – 26

Workers must decide now whether to make a commitment to these contracts, which span nearly the entire year. *See, e.g.*, ECF No. 6-20 at 2 (employment from January 15 to November 15, 2021). Many employers reserve the right to *decrease* (or increase) workers' pay if Defendants publish new prevailing wages or if a court orders a change to the prevailing wages. *See, e.g.*, ECF Nos. 6-20 at 15. All this will result, they argue, in domestic workers being pushed out of jobs with H-2A employers. ECF No. 20-1 at 3 (Brendan Monahan, Attorney with Stokes Lawrence states that if employers eliminate piece rates, domestic workers are "going to turn around and go work for your neighbor.").

All this, Plaintiffs lament, will result in "far-reaching downward pressure on local wages and working conditions, as growers this year will be approved to bring in more H-2A workers than they would need if they paid true prevailing wages." ECF No. 19 at 29–30.

Plaintiffs note that this hardship is exacerbated because farmworker families live near or below the poverty line. *See* ECF No. 4 at 1, 6; ECF No. 5 at 3, 5–6; ECF No. 6-26 at 4–5 (average farmworker family lives below the poverty line); ECF No. 6-28 at 3, 9–11 (high rates of food insecurity in farmworker families); ECF No. 6-23 at 13 (farmworker families have limited access to healthcare). So, such a decrease in wages has a profound and immediate impact on their livelihood. *See* ECF No. 4 at 1, 6; ECF No. 5 at 3, 5–6. Thus, while purely monetary damages

ORDER GRANTING IN PART PLAINTIFFS' REVISED MOTION FOR PRELIMINARY INJUNCTION – 27

are usually not considered irreparable, courts recognize an exception when plaintiffs are "so poor that [they] would be harmed in the interim by the loss of the monetary benefits." *Lee v. Christian Coal. Of Am., Inc.*, 160 F. Supp. 2d 14, 31 (D.D.C 2001) (internal citations omitted); *see also Kildare v. Saenz*, 325 F.3d 1078, 1083 (9th Cir. 2003) ("[E]conomic hardship constitutes irreparable harm"). "[B]ack payments cannot erase either the experience or the entire effect of several months without food, shelter, or other necessities." *Kildare*, 325 F.3d at 1083; *see also Haskins v. Stanton*, 794 F.2d 1273, 1276–77 (7th Cir. 1986) ("[T]he deprivation of food is extremely serious and is quite likely to impose lingering, if not irreversible, hardships.") (internal quotations omitted); *United Farm Workers*, 2020 WL 7646406, at *16 (farmworkers suffered irreparable harm where new AEWR methodology will result in "material wage deductions").

And Plaintiffs "cannot typically recover monetary damages flowing from their injury," so the economic harm is irreparable. *See E. Bay Sanctuary Covenant v. Trump*, 950 F.3d 1242, 1280 (9th Cir. 2020). Plaintiffs seek only injunctive relief because they "know of no cause of action under which the government could be liable for lost wages." ECF No. 19 at 31. And even if they could, Plaintiffs argue, workers would face huge barriers to collecting lost wages, such as lack of access to legal resources, geographic dispersion, and employers' assertion of a reliance defense. ECF No. 19 at 31–32.

ORDER GRANTING IN PART PLAINTIFFS' REVISED MOTION FOR
PRELIMINARY INJUNCTION – 28

Altogether, Plaintiffs have established "that irreparable harm is *likely*, not just possible." *See All. for the Wild Rockies*, 632 F.3d at 1131 (emphasis in original).

## G.    Equitable Factors

"There is generally no public interest in the perpetuation of unlawful agency action." *League of Women Voters v. Newby*, 838 F.3d 1, 12 (D.C. Cir. 2016). "Relevant equitable factors" for assessing whether the public interest is served by an injunction include the public interest in avoiding the harm caused by the agency action and preserving congressional intent. *E. Bay Sanctuary*, 950 F.3d at 1280. Depression of local farmworker wages causes the exact harm that Congress sought to prevent in the H-2A program. 8 U.S.C. § 1188(a)(1)(B); *see also Alfred L. Snapp & Son, Inc.*, 458 U.S. at 596. And the public interest is served by stability in farmworker wages.

Plaintiffs assert that the changed methodology undermines Defendants' statutory duty to protect the wages and working conditions of domestic farmworkers. They assert that the elimination of prevailing piece rates also diminishes the working conditions of farmworkers by shifting the incentive structure. Rather than incentivizing workers to "work fast without close supervision," employers, who still want the same output, will use non-incentive tactics such as discipline and threats to fire those who do not work at a certain pace. *See* ECF No. 20-3 at 2; *see also* U.S. Gov't Accountability Office, GAO-15-154,

ORDER GRANTING IN PART PLAINTIFFS' REVISED MOTION FOR PRELIMINARY INJUNCTION – 29

H-2A and H-2B Visa Programs: Increased Protections Needed for Foreign Workers 37-38 (March 2015), https://www.gao.gov/assets/690/684985.pdf (noting that financial consequences force farmworkers to tolerate workplace abuse).

Because this is "contrary to clear congressional intent," Plaintiffs argue, the agency action must be set aside under the APA. *See Planned Parenthood of Greater Wash. & N. Idaho v. U.S. Dep't of Health & Human Servs.*, 946 F.3d 1100, 1112 (9th Cir. 2020). When Congress established the H-2A program, it espoused a clear intent to protect the wages of domestic farmworkers, because the prior, similar foreign worker program had failed in that regard. 8 U.S.C. § 1188(a)(1)(B); *see also Alfred L. Snapp & Son, Inc.*, 458 U.S. at 596 ("The obvious point of this somewhat complicated statutory and regulatory framework is to provide two assurances to United States workers . . . First, these workers are given a preference over foreign workers . . . Second, to the extent that foreign workers are brought in, the working conditions of domestic employees are not to be adversely affected, nor are United States workers to be discriminated against in favor of foreign workers"). Likewise, Handbook 385 was developed to protect the wages of domestic farmworkers. ECF No. 20-4 at 4. *See also* 85 Fed. Reg. 70445, 70450 (Nov. 5, 2020) (AEWR and prevailing wages are both intended to provide safeguards against wage depression).

The survey should identify the *prevailing* wage paid in the open labor market. *See* ECF No. 6-2 at 5; *see also* ECF No. 6-2 at 2 ("Accurate farm wage data are

ORDER GRANTING IN PART PLAINTIFFS' REVISED MOTION FOR PRELIMINARY INJUNCTION – 30

essential to the effective operation" of "serving farm employers and farmworkers and in implementing the Secretary's regulations . . . on the recruitment of farm workers"). The public interest is served by the survey accurately reflecting current wage trends—even if they are not fair to workers. As described above, the current administration of the survey has led to arbitrary "wage setting," rather than "wage finding." The equitable factors thus favor Plaintiffs.

## H.    Five Percent Increase to the 2018 Prevailing Wages

On top of asking this Court to return to the prevailing wages derived from the 2018, Plaintiffs also ask this Court to increase those wages by five percent. ECF No. 19 at 36. Defendants argue that this is itself arbitrary. *See* Tr. (Feb. 18, 2021). This Court agrees. It recognizes that Plaintiffs do not pull the five percent figure out of thin air. But the figures and calculations cited by Plaintiffs show wage increases that vary greatly from year to year. *See* ECF Nos. 7, 7-1, 7-2 & 7-3. True, the averages come out to about five percent, *see* ECF No. 7 at 3–8, but looking at the unaggregated data shows changes between two percent and eight percent. *See id.* Given all the factors that could influence how much wages increase from year to year, the Court cannot implement the five percent figure. The law is not clearly in Plaintiffs' favor.

//

//

1

## I.    Bond

2        Plaintiffs state they do not have the financial means to post a bond if the Court

3   issues injunctive relief. ECF No. 5 at 3. Defendants did not respond to this

4   argument. *See* ECF No. 23. The Court has discretion "as to the amount of security

5   required, *if any*" and "may dispense with the filing of a bond when it concludes

6   there is no realistic likelihood of harm to the defendant from enjoining his or her

7   conduct." *Johnson v. Couturier*, 572 F.3d 1067, 1086 (9th Cir. 2009). The Court

8   does not require a bond in this case.

9                           **CONCLUSION**

10       Perhaps piece rate wages with hourly guarantees have suddenly and

11  drastically become more common across all agricultural activities in Washington

12  State. But with a survey that allows for confusion and manipulation, Defendants

13  cannot engage in a meaningful wage finding process. Their decision to rely on the

14  invalid survey results is arbitrary and capricious. While no survey can be perfect,

15  the present survey seems to entirely disregard accuracy. The survey does not define

16  essential terms, and Defendants do not validate the data through worker surveys or

17  other means. Defendants ignore glaring pitfalls, despite ESD and others drawing

18  attention to them.

19       Plaintiffs have also shown great irreparable harm is likely, not just possible.

20  Considering the merits, the harm, and the equitable factors, the Court fashions the

ORDER GRANTING IN PART PLAINTIFFS' REVISED MOTION FOR
PRELIMINARY INJUNCTION – 32

injunctive relief as follows: The Court orders Defendants to return to the prevailing wage rates previously certified from the 2018 survey for *all harvest activities*.

The Court will also require Defendants to conduct a prevailing wage survey in a fashion that is not arbitrary and capricious, even if that requires resurveying employers. The Court will allow Defendants, in tandem with ESD as appropriate, to use proper discretion in determining a proper survey but notes that it must avoid the methodological pitfalls of the 2019 survey discussed above.

Accordingly, **IT IS HEREBY ORDERED**:

1.    Defendants' unopposed Motion to Take Judicial Notice, **ECF No. 55**, and related motion to expedite, **ECF No. 56**, are **GRANTED**.

2.    Plaintiff's Revised Motion for Preliminary Injunction, **ECF No. 19**, is **GRANTED IN PART AND DENIED IN PART**.

3.    Defendants must **CHANGE** the prevailing wage rate for *all* Washington State harvest activities to the previous prevailing wage rate certified from the 2018 prevailing wage survey.

//

//

//

//

//

**4.** Defendants must **CONDUCT** a prevailing wage survey, within a reasonable time, that is not arbitrary and capricious, in order to certify new—current—prevailing wage rates.

**IT IS SO ORDERED.** The Clerk's Office is directed to enter this Order and provide copies to all counsel.

**DATED** this 1st day of March 2021.

SALVADOR MENDOZA, JR.
United States District Judge

ORDER GRANTING IN PART PLAINTIFFS' REVISED MOTION FOR PRELIMINARY INJUNCTION – 34